**Terry L. WARRICK, et al., Plaintiffs,**

v.

**Karen F. SNIDER, Secretary of the Pennsylvania Department of Public Welfare, et al., Defendants.**

**Civil Action No. 94–1634.**

United States District Court,
W.D. Pennsylvania.

Dec. 9, 1997.

Witold Walczak, Pittsburgh, PA, Public Inst. Law Cent. of Philadelphia, Stephen Gold, Community Legal Serv. Inc., Richard Weishaupt, Philadelphia, PA, Cent. PA Legal Serv., Peter Zurflieh, Harrisburg, PA, for Plaintiffs.

Thomas F. Halloran, Pittsburgh, PA, for Defendants.

## OPINION and ORDER OF COURT

AMBROSE, District Judge.

This lawsuit challenges the constitutionality of a durational residency requirement for the receipt of General Assistance ("GA"). Section 6 of Pennsylvania's "Act 49," 62 P.S. § 432.4(a) (Supp.1995), effective September 1, 1994, imposes a sixty day residency requirement on individuals seeking cash wel-

fare benefits under the GA program.[1] Plaintiff Terry Warrick, and the class of indigent persons which she represents, were denied GA benefits solely on the basis that she, and they, had not resided in Pennsylvania for sixty days prior to applying for the benefits. Warrick asserts that the durational residency requirement violates both her fundamental right to travel, and her right to equal protection under the Fourteenth Amendment. Jurisdiction is predicated upon 28 U.S.C. § 1331 and § 1343.

The Amended Complaint contains a demand for preliminary injunctive relief. By Opinion and Order dated June 30, 1995, I denied Warrick's request for preliminary injunctive relief, on the basis that she had not established a likelihood of success on the merits. Specifically, I determined that the sixty day durational residency requirement did not amount to a penalty on an individual's right to travel. Applying the rational basis test to the statute, I concluded that Pennsylvania's goal of encouraging employment and self-reliance was legitimate, and that the residence requirement was rationally related to that goal. See Docket No. 24.

At the request of the parties, this case was subsequently marked "closed." See Docket No. 45. In January of 1997, the parties requested that the case be reopened, and, several months later, they filed dispositive motions. Currently pending is Plaintiffs' Revised Motion for Summary Judgment (Docket No. 57).[2] Warrick contends, essentially, that the durational residency requirement is unconstitutional, failing both a strict scrutiny and/or a rational basis analysis.

The Commonwealth, relying almost exclusively upon my earlier denial of injunctive relief, disputes Warrick's contentions. I take a moment, however, to remind the Commonwealth that findings of fact and conclusions of law rendered in conjunction with a prelimi-

---

1. While the statute was amended to increase the durational requirement to twelve months, see Act 35–1996 (May 16, 1996), the state Attorney General concluded that the twelve month requirement was an unenforceable, unconstitutional penalty on migration, and thus reinstated the sixty day requirement, despite its repeal by the legislature. See 26 Pa. Bull. 6231 (Dec. 28, 1996), attached to (Docket No. 52, Ex. 1).

2. While the Commonwealth purported to file a Cross–Motion for Summary Judgment (Docket No. 60), the motion is untimely. Dispositive motions were to be filed no later than May 9, 1997. The Cross–Motion was not filed, however, until July 2, 1997. Accordingly, I will treat the purported "Cross–Motion" as simply a brief in opposition to Plaintiffs' Motion.

nary hearing, are not binding at this procedural posture. As noted by the United States Court of Appeals for the Seventh Circuit, when considering the impact of the legal conclusions reached in a preliminary hearing upon a subsequent motion for summary judgment:

> [t]he court's previous holding, being a decision on a motion for preliminary injunction, was itself only preliminary and subject to revision at any time.... In fact, we have advised district courts to be cautious in adopting conclusions of law made in ruling on a preliminary injunction because the posture of the case at that time inevitably entails incomplete evidentiary materials and hurried consideration of the issues.... Caution is also necessary because a motion for summary judgment raises a different decisional question for the judge than does a motion for preliminary injunction.
>
> Consideration of the former requires the judge to inquire whether there is any issue of material fact when the facts and inferences therefrom are viewed most favorably to the non-movant; the latter, whether there is a reasonable likelihood the moving party will prevail on the merits.... Thus, when the LDF moved for summary judgment, ... the district judge ... was not only free, but more properly put, obliged, to reconsider each of her decisions on the motion for preliminary injunction.

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse—Wis.*, 991 F.2d 1249, 1258 (7th Cir.1993); *see also CFTC v. American Metals Exchange Corp.*, 991 F.2d 71, 80 (3d Cir.1993); and *Country Floors v. Partnership of Gepner and Ford*, 930 F.2d 1056, 1062 (3d Cir.1991).

Having reconsidered, as obliged, my earlier findings, on the basis of a more complete factual record, I conclude that the sixty day durational residency requirement is, in fact, unconstitutional, failing both a strict scrutiny and rational basis analysis. Accordingly, Plaintiffs' Motion for Summary Judgment is granted.

### STANDARD

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the court must examine the facts in a light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.1987), *cert. denied*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the nonmoving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial *Celotex*, 477 U.S. at 322. Once the moving party satisfies this burden, the burden shifts to the nonmoving party, who must go beyond its pleadings and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324.

### ANALYSIS

While addressing the constitutionality of a statute is always difficult, the task before me is made immeasurably easier by virtue of Judge Newcomer's recent decision in *Maldonado v. Houstoun*, 177 F.R.D. 311 (E.D.Pa.

1997). In *Maldonado,* plaintiffs challenged "the constitutionality of the 'multi-tier' durational residency requirement contained in Section 9(5)(ii) of Act 35, codified at 62 P.S. § 432(5)(ii)." *Maldonado,* p. 315. Section 9(5)(ii) provides that:

> [c]ash assistance for applicants and recipients of aid to families with dependent children who have resided in this Commonwealth for less than twelve months shall not exceed the lesser of the maximum assistance payment that would have been received from the applicant's or recipient's state of prior residence or the maximum assistance payment available to the applicant or recipient in this Commonwealth.

62 P.S. § 432(5)(ii). The Maldonados, who applied for cash assistance after moving from Puerto Rico, received only $304 per month by virtue of § 9(5)(ii), rather than the $836 per month that similarly situated families who have lived in Pennsylvania for the past 12 months received. As a consequence, the Maldonados sought declaratory and injunctive relief, asserting that the multi-tier durational residency requirement violated, in part, the right to travel and the right to equal protection.

Faced with a request for preliminary injunctive relief, Judge Newcomer engaged in an exhaustive analysis of Supreme Court cases involving durational residency requirements. In particular, Judge Newcomer dissected the landmark decision announced in *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), as well as modifications to that decision. In conducting this analysis, Judge Newcomer noted that the Supreme Court has subtly shifted away from the *Shapiro* analysis in recent years. *Maldonado,* p. 323–28.

Given Judge Newcomer's thorough and scholarly analysis, I feel no need to independently trace the development of the case law. Suffice it to say that I agree with Judge Newcomer's conclusion that "[w]hatever the current state of the Supreme Court's right to migrate jurisprudence, the Court must apply the *Shapiro* analysis to the case at bar because it is still binding precedent on this Court due to the fact that it has never been

overruled and its facts are similar to this case." *Maldonado,* p. 328.

"Under *Shapiro* and its progeny," Judge Newcomer explains, "a state law implicates the fundamental right to travel and therefore triggers strict scrutiny: (1) when impeding interstate travel is its primary objective; (2) when it actually deters such travel; or (3) when it uses any classification which serves to penalize the right to travel." *Maldonado,* p. 328, *quoting Attorney General of New York v. Soto–Lopez,* 476 U.S. 898, 903, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (internal quotation marks and brackets omitted). If these three factors are not at play, the statute need only be rationally related to a legitimate government purpose to survive a constitutional challenge.

Warrick urges that the durational residency requirement fails both the strict scrutiny and rational basis tests. I will address each of Warrick's arguments *seriatim.*

## I. *STRICT SCRUTINY ANALYSIS*

Warrick contends that § 432.4(a) was designed to impede travel, actually impedes travel, and creates a classification which penalizes the right to travel, and thus is subject to a strict scrutiny analysis. The sixty day durational residency requirement, Warrick concludes, fails to survive application of a strict scrutiny analysis.

(A). *Purpose of impeding travel* [3]

As noted by Judge Newcomer, "[t]he Supreme Court has repeatedly stated that a law enacted for the purpose of inhibiting migration into [a] state is virtually unconstitutional." *Maldonado,* p. 329, *citing, Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 620 n. 9, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985), *Zobel v. Williams,* 457 U.S. 55, 62 n. 9, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982); *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 263–64, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); and *Shapiro,* 394 U.S. at 629. "If a law has 'no other purpose than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional.'" *Sha-*

---

**3.** This issue was not before me at the preliminary injunction stage.

*piro,* 394 U.S. at 631 (citations omitted). Thus, only if the "primary objective" of § 432.4(a) is the impermissible purpose of deterrence, should strict scrutiny be applied. *See Maldonado,* p. 329–30, *citing, Soto–Lopez,* 476 U.S. at 903.

Warrick, citing to the statute's legislative history, urges that the primary objective of the statute is to deter migration. Statements made by key senators certainly buttress Warrick's allegations. For example, Majority Whip Senator D. Michael Fisher, chief sponsor and floor spokesperson for Act 49, commented that:

> For many, many years, people have been coming to all of us and they have told us stories, whether it be as the gentlemen [sic] from Butler, Senator Shaffer, earlier today told us about Ohioans signing up for welfare in New Castle, or whether it be someone getting off a bus in Philadelphia or Harrisburg and signing up for welfare.... What we are trying to do in this legislation is to try to attack at least one of the problems of the growing cost of welfare in Pennsylvania.

Pa. Legislative Journal Senate, at 2249 (June 8, 1994). Senator John E. Patterson, Chairman of the Public Health and Welfare Committee where the bill originated, similarly stated that, "I do not understand how people can be against a 60–day residency rule. I have never understood why Pennsylvanians felt they should have to pay for welfare needs across this country." *Id.* at 2253.

Senators Fisher's and Patterson's statements, as do others cited in Warrick's brief, certainly lend themselves to the interpretation that a goal of the legislation was to keep indigents from relocating to Pennsylvania. Another key provision in the statute reinforces this conclusion. While the Commonwealth initially denies cash assistance to new residents, if that individual agrees to leave the Commonwealth, temporary benefits will, in fact, be paid. *See* 62 P.S. § 432(5)(i). It requires no great leap in logic to view the Commonwealth's willingness to lend aid to an indigent person, if that person is willing to relocate, as an effort to keep indigent persons from settling in Pennsylvania.

The Commonwealth counters that this Court is restricted in determining the primary objective of legislation by what is set forth in the statute. I do not agree. That statements made during debates concerning passage of a bill are relevant to determining the purpose and intent of a provision is so well established that it needs no citation to authority. Having considered these statements, as well as the effect of § 432(5)(i), I do believe that *one* purpose of the durational residency requirement was, in fact, to impede migration.

Yet *Shapiro* only requires application of the strict scrutiny analysis if impeding migration is the *primary* purpose of the provision. I cannot reach this conclusion. Section 401, entitled "legislative intent," provides as follows:

> a. It is hereby declared to be the legislative intent to promote the welfare and happiness of all the people of the Commonwealth, by providing public assistance to all of its needy and distressed; that assistance shall be administered promptly and humanely with due regard for the preservation of family life, and without discrimination on account of race, religion, or political affiliation; and that assistance shall be administered in such a way and manner as to encourage self-respect, self-dependency and the desire to be a good citizen and useful to society.
>
> b. It is hereby declared to be the legislative intent that no recipient of cash or medical benefits shall be entitled to indefinite government support unless it can be established that;
>
> > (1) a person is permanently disabled and unable to work; or
> >
> > (2) the person is required to be in the home full-time to care for a dependent adult or child who requires constant attention and supervision.

62 P.S. § 401 (Act 49 of 1994). Thus, the express legislative purpose is to promote self-respect and self-dependency. This correlates to what the Commonwealth claims is the driving purpose behind § 432.4(a)—to encourage employment.

In *Maldonado,* where plaintiffs also claimed that a residency requirement had as its primary purpose to impede migration, Judge Newcomer found a similar expression of legislative intent to be very clear. Section

401 of Act 35 provided that: "It is hereby declared to be the legislative intent to promote the self-sufficiency of all the people of the Commonwealth." *Maldonado*, p. 330. Although the plaintiffs introduced statements made during floor debates similar to those identified by Warrick, Judge Newcomer held that:

> The snippets of legislative history and the statement from DPW do not convince this Court that the primary objective behind the enactment of Section 9(5)(ii) was to deter migration in light of the clear legislative intent of Act 35, which is to encourage self-sufficiency and work.

*Maldonado*, p. 330.

I agree with Judge Newcomer. Although I do believe that one purpose of imposing the durational residency requirement is to deter migration, in light of the clear expression of legislative intent in § 401—to promote self-dependence—I am not convinced that the *primary* purpose of the provision is to deter migration. Accordingly, strict scrutiny will not be applied on this basis.

### (B) *Actual deterrence* [4]

 Warrick alleges that "[t]he residency requirement also warrants strict scrutiny because it actually deters poor people from permanently settling in Pennsylvania." (Docket No. 52, p. 23). Yet Warrick has not proffered any statistical evidence in support of this assertion. Indeed, the evidence of record submitted by Warrick defeats such a claim. John Hartman, an Assistant Professor of Sociology at Columbia University, with a specialization in social science statistics, submitted a declaration in which he takes great pains to refute any claim that Pennsylvania is a "welfare magnet." That is, he contends that indigent people do not consider which state may offer the most generous welfare benefits before deciding to relocate. Such a contention defeats any claim that a

**4.** The issue of actual deterrence was not raised at the preliminary injunction hearing.

**5.** Warrick cites to *Maricopa*, 415 U.S. at 258, and other cases, in support of a claim that actual proof of deterrence is unnecessary. The passages referenced by Warrick, however, speak of the irrelevance of actual deterrence when the

durational residency requirement, in fact, deters migration.

The dearth of empirical evidence convinces me, as it did Judge Newcomer in *Maldonado*, that strict scrutiny is not applicable in this instance. I will not decide a constitutional question based upon speculation. [5]

### (C) *Imposition of a Penalty*

 Finally, the *Shapiro* decision also stands "for the proposition that a classification which operates to *Penalize* those persons ... who have exercised their constitutional right of interstate migration must be justified by a compelling state interest." *Maricopa*, 415 U.S. at 258 (internal quotation marks and citations omitted, emphasis in original). While what precisely constitutes a "penalty" has not been clearly articulated, guidelines do exist. For example, in *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the Court determined that the denial of the right to vote, a "fundamental political right," constitutes a penalty. In *Shapiro*, the Court found deprivation of the "basic necessities" of life, such as food and shelter, to be a penalty. Finally, denial of access to nonemergency medical care has also been declared an unconstitutional penalty. *Maricopa*, 94 S.Ct. at 1088.

In contrast, a one year durational residency requirement as a condition to lower tuition at state institutions of higher learning is not a penalty. *See Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973). Similarly, a one year residency requirement for petitioners seeking a divorce decree was declared not to be a penalty. *See Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). And in *Shapiro*, the Court cautioned that residency requirements determining eligibility "to obtain a license to practice a profession, to hunt, or fish" may not constitute a penalty. *Shapiro*, 394 U.S. at 638 n. 21.

statute actually *penalizes* the right of migration. The question of whether a statute imposes a penalty is distinct from that of whether there is actual deterrence. Accordingly, if the court finds a penalty to exist, strict scrutiny is applicable regardless of whether actual deterrence exists. I therefore am not persuaded by Warrick's argument in this regard.

The question then, is this—does a durational residency requirement of sixty days for the receipt of cash benefits constitute a penalty? I answered this question in the negative when addressing the request for preliminary injunctive relief. I based my decision upon the Commonwealth's representations that new residents were "not being deprived of the things that are necessary for their very survival...." (Docket No. 24, p. 17). The testimony offered by the Commonwealth indicated that "new residents are eligible for food stamps, emergency housing and rent money when necessary, and the medical care necessary for basic health, [and are also eligible for] assistance in finding new employment, without regard to any waiting period." (Docket No. 24, p. 17). Based upon these representations, I found the facts of this case to be distinguishable from those in *Shapiro* and *Maricopa*, where the durational residency requirements had potentially life-threatening consequences, and those in *Zobel* and *Soto-Lopez*, where the classifications created were permanent and the treatment of the classes never equalizes. (Docket No. 24, p. 17–18).

But, as stated above, findings of fact and conclusions of law reached during a preliminary injunction hearing are not binding when addressing a motion for summary judgment. Indeed, given the different procedural postures, I am obligated to reconsider and reexamine my earlier findings. Having reexamined the issue of a "penalty" in light of the more fully developed factual record, I find that the durational residency requirement does, in fact, amount to a penalty, as it may deprive new residents of such basic necessities as shelter, food, medical assistance, and employment training.

**(1) Shelter**

For instance, contrary to the Commonwealth's representations during the earlier hearing, emergency assistance is *not* readily available to indigent new residents. Of the 4502 people who were denied cash assistance because of the durational residency requirement at the time the record was developed, *not a single person* received emergency assistance. *See* Docket No. 54, Ex. 22. Absent emergency assistance, indigent new residents are unable to pay for housing. For

those who do not have the luxury of a family member or friend willing to provide shelter, the denial of emergency assistance leads to the very real possibility of homelessness. Donna Cooper, Executive Director of the Philadelphia Mayor's Office of Community Services, explains that, in Philadelphia (which has the highest concentration and largest number of low income people in the Commonwealth), "[t]he City's emergency shelters are full and are therefore not immediately or always open to the homeless, new residents." Docket No. 53, Ex. 1, ¶ 5. "Public housing or federally subsidized housing," Cooper continues, "too, would be unavailable, as this housing has long waiting lists numbering into the thousands of people who have been on waiting lists for much longer." *Id.*

Charlotte Murray who moved, along with her husband and 10 of 12 children, to Philadelphia in search of work, initially obtained shelter in a cousin's 3 bedroom house, which already housed 9 people. Docket No. 53, Ex. 8, ¶ 12. Murray's entire family was forced to live on the floor. *Id.* Murray inquired of the Department of Public Welfare about affordable housing, but was told that no help was available. Murray and her family had to leave her cousin's house and, lacking shelter, walked to a number of homeless shelters in search of lodging. *Id.* at ¶ 14. Neither the Salvation Army, nor the Saints James and Barnabas Missions were able to help. *Id.* Facing the immediate possibility of a night on the streets, dangerous at any rate but especially so because one of the children was suffering from undiagnosed strep throat, Murray finally obtained shelter at the Parker Hotel, through the generosity of the Traveler's Aid Society. *Id.* at ¶ 15. Murray explains, however, that:

> [s]ince we had no money for rent and a security deposit, we were not able to move out of our temporary quarters at the Parker Hotel. We were informed by the Traveler's Aid Society that our temporary housing there could end at any time. It was very upsetting to know that we could be back on the street with our ten children at any time.

*Id.* at ¶ 21.

While Traveler's Aid was able to offer some assistance to Murray, its resources are

limited and they are not able to help everyone, and the receipt of cash assistance is vital to securing housing. Ernest Eskin, the Executive Director in Philadelphia, explains that "[t]he availability of GA ... allows the newcomer to be able to secure a shelter bed and not be homeless, as shelters will be more likely to keep you if you have welfare income that is paid to the shelter. The Pennsylvania GA residency requirement will thus increase homelessness among newcomers who will not have funds to rent a room or will have reduced access to a city shelter." Docket No. 53, Ex. 3, ¶ 10. Eskin warns that "[w]ithout [GA], neither private social service agencies nor the City of Philadelphia can meet the financial needs of new residents. It remains an essential and unique safety-net for new residents here." *Id.* at ¶ 12.

The Commonwealth offers no persuasive evidence to rebut the very real likelihood that, absent cash assistance, indigent new residents face homelessness. Certainly the Commonwealth did not come forward with any explanation as to why the 4502 people included in Warrick's figures were denied emergency assistance. Nor did the Commonwealth identify other individuals, not included in the 4502 figure, who were, in fact, granted emergency assistance. Instead, the Commonwealth offers the affidavit of Patricia O'Neal, Director of the Bureau of Policy at the Department of Public Welfare. O'Neal simply attaches to her affidavit a "Community Services Index." The Index, O'Neal claims, lists those organizations available to indigent new residents to meet basic needs, such as shelter. The affidavit and "Index" are, however, of little value. The Index is simply a "laundry list" of organizations, without any details as to precisely what services are provided, and whether the organizations are even able to meet every need. Additionally, a number of organizations listed under the heading pertaining to "basic needs," have seemingly nothing to do with the provision of shelter and/or food, *i.e.*, Adult Literacy Center, Better Business Bureau, Big Brothers/Big Sisters, Boy Scouts of America, Boys and Girls Clubs, Community Legal Services, County 4-H, County Adult/Juvenile Probation Departments, County Public Defenders Office, Pennsylvania Department of Environmental Resources, Girl Scout Council and Hispanic Organizations. *See* O'Neal Affidavit, Ex. 1, attached to Docket No. 59.

Stephen Zivkovich, Operations Director of the Allegheny County Assistance Office, and employed by the Department of Welfare, offers a similar affidavit. In support of his conclusory statement that "[w]hile a person is waiting to receive cash assistance, there are other resources to meet basic living needs which are provided through federal, state, or private funds," Zivkovich attaches a list of organizations. Zivkovich's list suffers from the same shortcomings as does O'Neal's. The list does not provide any detail as to the resources available to each organization, or whether the organizations are able to accommodate every request for aid. *See* Zivkovich Affidavit, attached to Docket No. 59.

Finally, the Commonwealth offers the affidavit of F.J. Bostwick, Director of Community Services of the Department of Welfare, who provided a list of services available in Philadelphia County. *See* Bostwick Affidavit, attached to Document No. 59. While Bostwick's list does provide a brief narrative, it too fails to provide any information as to whether the organizations are able to accommodate all requests for help. Consequently, I do not find the O'Neal, Zivkovich or Bostwick affidavits to hold any persuasive value.

Considering the evidence proffered on behalf of both parties, I necessarily find that, while Emergency Assistance may be available, and while other organizations may exist for the purpose of providing shelter, Emergency Assistance and housing are available only in theory. The deprivation of shelter for any portion of sixty days is hardly a trivial matter, and cannot be likened to a delay associated with securing a hunting or fishing license, or obtaining a divorce.

### (2) Food

Aside from the issue of shelter, there remains a similarly important issue of food. Warrick proffers evidence that: (1) not all indigent new residents receive food stamps; (2) the allotment of food stamps, if given, may not be sufficient; and (3) many basic items cannot be purchased with food stamps.

For instance, of the new residents denied cash assistance solely because of the residency requirement, only 37.3% received food stamps. *See* Docket No. 54, Ex. 19. That leaves the possibility that approximately 63% of indigent new residents were denied food stamps, and were thus without means of readily obtaining food. And for those comprising the 37%, the allotment may not be enough. Those without access to adequate shelter and thus without access to a refrigerator, stove and/or oven, are not able to make food stamps "stretch." Charlotte Murray explains that "[s]ince we did not have kitchen facilities at the Parker Hotel, we had to use food stamps for more expensive, semi-prepared foods. Also, we had to throw away unused food, like the baby's milk, because we did not have refrigeration." Docket No. 53, Ex. 8, ¶ 23. Finally, even if adequacy of the allotment was not an issue, the fact remains that food stamps may not be used to purchase certain essential items. Again, Charlotte Murray testified that, until she received her first cash assistance check, she "did not have money for toiletries, personal care products, clothing, transportation, baby diapers, laundry, or basic school supplies for [her] family of twelve." *Id.*, at ¶ 22.

The Commonwealth offers nothing to rebut Murray's testimony, or Warrick's statistical evidence. Rather, the Commonwealth simply relies upon the organizations to which new residents may presumably go for food, listed in the aforementioned affidavits. As discussed above, however, the affidavits and the corresponding lists are unpersuasive. They offer no concrete details of whether an indigent new resident can, in fact, secure sufficient food.

### (D) Medical Care

In addition to concerns over shelter and food, the durational residency requirement raises concerns about medical care. During the sixty day waiting period, new residents are denied the filling of medical prescriptions. Without cash assistance, these prescriptions, and other medical needs, may go unfilled. Again, Charlotte Murray's testimony is instructive on this issue. Murray, who had secured a data entry job during the waiting period, had to decline employment due, in part, to a lack of necessary eye glasses:

> [b]y using my medical card, I was able to have my eyes examined by a doctor. Although I am nearly blind in one eye and my vision is blurred in the other eye, I was not able to get glasses since the medical assistance program does not cover the cost of glasses for adults. I was very concerned about this because I realized that I would need glasses in order to perform any data entry job.

*Id.* at ¶ 24.

Again, the Commonwealth offers no evidence supporting a conclusion that organizations exist to aid indigents in Ms. Murray's position. I recognize that the Commonwealth does offer emergency care. I nevertheless believe that other medical needs, although perhaps not of an emergency nature, are vital to meeting an individual's basic life needs. Indeed, the Supreme Court recognized as much in *Maricopa*.

In *Maricopa*, the Supreme Court considered whether a one year durational residency requirement for the treatment of *nonemergency* medical care constituted a penalty. The Court concluded that such a denial did constitute a penalty, noting that

> "[t]he State could not deny [plaintiff] care just because, although gasping for breath, he was not in immediate danger of stopping breathing altogether. To allow a serious illness to go untreated until it requires emergency hospitalization is to subject the sufferer to the danger of a substantial and irrevocable deterioration in his health. Cancer, heart disease, or respiratory illness, if untreated for a year, may become all but irreversible paths to pain, disability, and even loss of life. The denial of medical care is all the more cruel in this context, falling as it does on indigents who are often without the means to obtain alternative treatment."

*Maricopa*, 415 U.S. at 260–261. I do not suggest that the factual circumstances in *Maricopa* are identical to those presented by Murray. Nevertheless, I believe, as did the Supreme Court, that a compromise in the ability to access medical care, may have dire consequences. Absent the receipt of cash

assistance, indigent new residents may be deprived, as was Charlotte Murray, of necessary medical items such as eye glasses. Again, I find such a denial to be distinguishable from the denial of a hunting or fishing license.

### (E) Employment Training

Access to employment training does not, I believe, qualify as a "basic life necessity." Nonetheless, I discuss such access given that the Commonwealth's justification for imposing a waiting period is to encourage employment, and because the Commonwealth defended the request for preliminary injunctive relief, in part, based upon the alleged access to employment training. Significantly, however, the Commonwealth now admits that new residents can only get training assistance and/or training stipends *if* they are already recipients of cash assistance. *See* Docket No. 54, Exs. 14–17. During the sixty day waiting period, new residents are *denied* cash assistance. Ergo, the Commonwealth does not provide new residents with employment training or stipends during the waiting period. Again, the only evidence offered to refute the conclusion that training is unavailable, is the affidavits discussed, and dismissed, above.

### (F) Conclusion

In conclusion, then, the only persuasive evidence of record suggests that indigent new residents denied cash assistance, run the very real risk of being homeless and without sufficient food or other basic necessities. Food and shelter are the very same "basic life necessities" that the *Shapiro* court found to merit application of the strict scrutiny test.

In this sense, the instant case is distinguishable from *Maldonado.* In *Maldonado,* new residents were not entirely denied cash assistance. Indeed, Judge Newcomer distinguished *Shapiro,* in part, on this basis. *Maldonado,* p. 331 (stating, "[f]or example, the newcomers in *Shapiro* received no cash assistance. In this case, the newcomers receive TANF cash assistance at the same level they would have received in their state of prior residence."). Instead, the assistance given was the lesser of that received by the resident in his/her former state, or the allotment

prescribed by the Commonwealth. Receipt of cash benefits thus permitted plaintiffs in *Maldonado* to qualify for employment training, to supplement food stamps, to pay for rent, and to secure basic life necessities such as toiletries, which cannot be purchased with food stamps.

My conclusion that the durational residency requirement operates as a penalty is supported by other provisions of the Welfare Code. For instance, residents who wilfully and without good cause refuse to seek, accept or retain work are penalized by having their eligibility for cash assistance suspended. *See* 62 P.S. § 423.3(a)(1). Indeed, Patricia O'Neal herself explicitly described the suspension as a "penalty." *See* Docket No. 54, Ex. 24, p. 15. Additionally, individuals who commit welfare fraud lose cash assistance benefits for six months for the first offense, and twelve months for the second offense. *See* 62 P.S. § 481(f). Again, Patricia O'Neal, DPW's Director of Bureau of Policy, explicitly referred to these suspensions as "penalties." *See* Docket No. 54, Ex. 24, p. 61–62.

If the suspension or denial of cash assistance constitutes a penalty where an individual has declined to accept work, or has committed welfare fraud, it is disingenuous to describe a similar deprivation to new residents as an "incentive to work." The Commonwealth's attempts to engage in a game of semantics is not persuasive.

"Since the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by whether it promotes a *compelling* state interest." *Shapiro,* 394 U.S. at 638 (emphasis in original). As determined by the Supreme Court, a statute which impedes the ability to secure life's basic necessities in an effort to encourage employment and self-dependency, fails this test. *Id.* Accordingly, § 432.4(a) is unconstitutional.

### II. *RATIONAL BASIS ANALYSIS*

Even if application of the strict scrutiny analysis were not appropriate, I believe that the durational residency requirement would fail the rational basis test. Again, the *Maldonado* opinion is instructive. In *Maldo-*

*nado,* one of the proffered legitimate government objectives was "to encourage employment, self-respect and self-dependency among its welfare recipients, that is to encourage self-reliance over reliance on welfare." *Maldonado,* p. 332.[6] The Commonwealth has articulated the same legitimate purpose here. *See* Docket No. 61, p. 41 (stating that the "legitimate government objective [is] an intent to encourage self respect and self-dependency. That is to encourage self-reliance over reliance on welfare."). The Commonwealth explains that, by imposing the waiting period, its "hope is that the welfare applicant will choose or seek immediate employment over delayed cash assistance because self-sufficiency is a more attractive alternative than welfare." Docket No. 61, p. 5.

I recognize, as did Judge Newcomer in *Maldonado,* that encouraging work is an "admittedly permissible state objective." *Shapiro,* 394 U.S. at 634. Indeed, I find it to be a laudable goal. Yet the Commonwealth's means of fostering that goal is not rational. If the durational residency requirement is designed to encourage employment, logic would dictate that long term residents should undergo a similar waiting period. Judge Newcomer reached the same conclusion in *Maldonado. See Maldonado,* p. 332 (stating that "[t]o begin, if the goal of the multi-tier durational residency requirement is to promote self-sufficiency, for example by encouraging work, 'this logic would also require a similar waiting period for long-term residents of this State.' ", *quoting, Shapiro,* 394 U.S. at 637.). Indeed, as Judge Newcomer concluded, I find that the Commonwealth's "justification depends on the wholly unsubstantiated assumptions that newcomers to Pennsylvania are somehow less motivated than more established recipients to seek work and that, when they apply for cash assistance, the members of the latter group but not the former have exhausted any alternatives the Commonwealth has to offer." *Maldonado,* p. 332.

Accordingly, I find, as did the Supreme Court in *Shapiro,* and as did Judge Newcomer in *Maldonado,* that a durational residency requirement designed to encourage new resi-

dents to seek employment, fails to satisfy the rational basis test. Consequently, I hold that the classification created in § 432.4(a) is unconstitutional.

### ORDER OF COURT

After careful consideration of the submissions of the parties and for the reasons set forth in the Opinion accompanying this Order, it is hereby Ordered that the Plaintiffs' Revised Motion for Summary Judgment (Docket # : 57) is Granted. Defendants' purported Cross–Motion for Summary Judgment (Docket # : 60) is Denied. Section 432/4(a) of Title of Purdons is unconstitutional.

---

**6.** The other articulated purpose was to discourage "persons from shopping around for the 'best benefit package of the year.' " *Maldonado,* p.

332. This purpose is constitutionally impermissible.