Monica **WESTENFELDER,** Joanne Davenport, Jessica MacMillan, Natividad Soto, Jannette Vargas, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Christine **FERGUSON,** Director, Rhode Island Department of Human Services, Defendant.

No. Civ. A. 97–478L.

United States District Court, D. Rhode Island.

March 18, 1998.

David Cicilline, Providence, RI, Christopher Lamb, Center on Social Welfare Policy & Law, New York City, for Plaintiffs.

Terrence Tierney, Richard B. Woolley, Office of the Attorney General, Appellate Division, Providence, RI, for Defendants.

## OPINION AND ORDER

LAGUEUX, Chief Judge.

This case centers upon one aspect of the sweeping national changes in the manner by which government assists the needy. Specifically, the Court must review a State of Rhode Island statute which imposes a durational residency requirement for receipt of full cash assistance benefits.

The matter is before the Court on the motion of plaintiffs for a preliminary injunction to prevent defendant Christine Ferguson, Director of the Rhode Island Department of Human Services ("defendant"), from enforcing the durational residency requirement found in R.I.Gen.Laws § 40–5.1–8(e).[1]

---

1. Defendant is responsible for, *inter alia*, the enforcement of § 40–5.1–8(e). She is sued in her official capacity.

For the reasons that follow, the motion is granted and a preliminary injunction will be issued.

## I. Background

In 1996, Congress fundamentally changed the nature of the American welfare system by repealing the Aid to Families with Dependent Children ("AFDC") program, and replacing it with the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), codified at 42 U.S.C. §§ 601, *et seq.* In doing so, Congress aimed to increase the flexibility of the states to experiment with their welfare systems, with the ultimate goal of encouraging recipients to find work and end dependence on welfare. *See* 42 U.S.C. § 601. This new flexibility, however, remains subject to certain federal limitations, including the requirement that states encourage welfare recipients to work. *See, e.g.,* 42 U.S.C. § 607.

In addition, PRWORA expressly authorizes states to limit welfare benefits to new residents to the amount that such persons received in their prior state of residence. 42 U.S.C. § 604(c) states:

A state operating a program funded under this part may apply to a family the rules (including benefit amounts) of the program funded under this part of another State if the family has moved to the State from the other State and has resided in the State for less than 12 months.

Following enactment of PRWORA, the Rhode Island General Assembly passed the Rhode Island Family Independence Assistance Act, R.I.Gen.Laws §§ 40–5.1–1, *et. seq.* Effective as of May 1, 1997, this statute provides in relevant part:

Notwithstanding any other provision of this chapter, the amount of cash to which a family is entitled under the chapter shall be reduced by thirty percent (30%) until the family has been a resident of the state for twelve (12) consecutive months; provided, however, that no member of the family who has been resident of the state for twelve (12) consecutive months or longer shall have his or her benefit reduced under this subsection.

R.I.Gen.Laws § 40–5.1–8(e).

On August 21, 1997, plaintiffs, bona fide Rhode Island residents whose benefits were reduced by thirty percent pursuant to this durational residency requirement, filed a Class Action Complaint for Declaratory and Injunctive Relief.[2] Proceeding under 42 U.S.C. § 1983, they argue that the durational residency requirement violates: (1) their right to travel under the United States Constitution; (2) the Equal Protection Clause of the Fourteenth Amendment to the Constitution; (3) the Privileges and Immunities Clause of Article IV, § 2, "as secured by" the Fourteenth Amendment to the Constitution; and (4) PRWORA. They seek a preliminary injunction and ultimately a permanent injunction to bar defendant from enforcing § 40–5.1–8(e); a declaration that said provision is unconstitutional; an order that the action be maintained as a class action with notice to the class members; and costs and fees under 42 U.S.C. § 1988.

Plaintiffs originally sought a Temporary Restraining Order on the same grounds, but on August 26, 1997, this Court denied that request. On September 10–11, 1997, this Court held a hearing on plaintiffs' request for a preliminary injunction. The witnesses were: (1) plaintiff Monica Westenfelder; (2) Nancy Gewirtz, Ph.D., a professor of social work at Rhode Island College; (3) Susan Bodington, Assistant Director for Housing Policy at the Rhode Island Housing Mortgage Finance Corporation; (4) Jane Hayward, Associate Director in the Division of Management Services at the Rhode Island Department of Human Services; and (5) State Representative Antonio J. Pires, Chair-

---

**2.** Plaintiffs applied for provisional class certification pursuant to Fed.R.Civ.P. 23(b)(1) and/or (2), proposing that the class be defined as follows: All present and future applicants and recipients of assistance under the provisions of the "Rhode Island Family Independence Assistance Act" and the "Public Assistance Act" who have applied or will apply for assistance on or after May 1, 1997, and who have been or will be denied full level of benefits because they have not resided in the State of Rhode Island for twelve consecutive months immediately preceding their application for assistance.

man of the House Finance Committee. Exhibits were also introduced into evidence.

Following the taking of that evidence, the Court took the matter under advisement and post-hearing memoranda were filed. The Court has considered all the evidence presented and the arguments of the parties (orally and in writing), and now the matter is in order for decision.

## II. Standard for Decision

A party seeking a preliminary injunction must demonstrate that: (1) the movant enjoys a likelihood of success on the merits; (2) there exists the potential for irreparable harm to the movant if the injunction is denied; (3) the injunction would not impose a hardship on the nonmovant outweighing that to the movant in the absence of an injunction; and (4) the injunction will not adversely affect the public interest. *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir.1996); *Kleczek v. Rhode Island Interscholastic League, Inc.*, 768 F.Supp. 951, 953 (D.R.I.1991).

## III. Discussion

### A. Likelihood of success

■ "Likelihood of success is the main bearing wall of the four-factor framework." *Ross–Simons*, 102 F.3d at 16. The movant need not prove its claims at this early stage in the proceedings, but rather need only demonstrate that it is likely to succeed when the case is ripe for final decision. *Kleczek*, 768 F.Supp. at 953.

■ In this case, determining the likelihood of success requires the Court to undertake a careful consideration of plaintiffs, constitutional claims. They argue that Rhode Island's durational residency requirement acts as a "penalty" on the constitutional right to travel, triggering strict scrutiny under *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and its progeny.

Plaintiffs contend that the requirement is not narrowly tailored to serve a compelling state interest, and thus cannot survive strict scrutiny. They further submit that the requirement violates the Equal Protection Clause of the Fourteenth Amendment, because it is not rationally related to a legitimate state purpose.[3]

Defendant, meanwhile, responds that a mere thirty percent reduction in cash benefits, taken together with the unrestricted provision to newcomers of non-cash welfare benefits, does not rise to the level of a "penalty" upon the exercise of the right to travel. Thus, she argues, strict scrutiny is unwarranted. The purpose of the requirement, says defendant, is to encourage welfare recipients to find work and achieve self-sufficiency, and the statute is rationally related to that objective.

■ Plaintiffs, claim is properly analyzed under the Equal Protection Clause. The fundamental mandate of the Equal Protection Clause is that similarly situated persons should be treated alike. *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)). Within this basic precept, legislatures must be free to do their work, which at times requires drawing distinctions between individuals. As the Supreme Court has stated:

> A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

**3.** For the sake of clarity, the Court notes that plaintiffs have no constitutional right to receive welfare benefits. *Lavine v. Milne*, 424 U.S. 577, 584 n. 9, 96 S.Ct. 1010, 47 L.Ed.2d 249 (1976) (citing *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)); *see also* 42

U.S.C. § 601(b). Rather, the issue is whether Rhode Island, having chosen to provide such benefits, may constitutionally differentiate among bona fide residents in the form of the instant durational residency requirement.

*Id.* Thus, the role of the courts in reviewing legislation alleged to violate equal protection is generally a deferential one; courts do not second-guess the wisdom or efficiency of state action, but merely seek to insure its rationality. *Id.; see also Dandridge v. Williams,* 397 U.S. 471, 485–86, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

However, two varieties of statutory classifications are "presumptively invidious" and require additional judicial scrutiny: (1) those which distinguish among individuals based on a "suspect" classification; and (2) those which distinguish among individuals in a manner that impinges upon a fundamental right. *Plyler,* 457 U.S. at 216–17. "With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." *Id.* at 217.

The determination of which standard of review applies is an important threshold issue. Thus, the Court must begin by deciding whether to apply strict scrutiny to the present statute.[4]

Rhode Island's durational residency requirement does not involve a suspect class. However, it does involve the fundamental right to travel;[5] the question, then, is whether that involvement rises to a level requiring strict scrutiny.[6]

Whether strict scrutiny is appropriate turns on whether the durational residency requirement "penalizes" the exercise of the fundamental right to travel and to migrate from one state to another.[7] *See Shapi-*

---

4. In both *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985), and *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982), the Supreme Court considered state statutes that created fixed, permanent classifications based upon date of residency. In both cases, Chief Justice Burger delivered the Court's opinion holding that because the statutes failed even to pass the lax rational basis test, it was unnecessary to decide whether strict scrutiny applied. *Hooper,* 472 U.S. at 618; *Zobel,* 457 U.S. at 60–61. Chief Justice Burger reiterated this approach in a concurring opinion in *Attorney General of New York v. Soto–Lopez,* 476 U.S. 898, 912–16, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986). Justice Brennan, writing for a four-vote plurality in that case, specifically took Chief Justice Burger to task for failing to articulate the proper standard of review from the outset. *Id.* at 906 n. 6. However, Chief Justice Burger's approach remains the last to command a majority in a "right-to-travel" case.

This Court concurs with Chief Justice Burger's approach, but, as a result of the unclear status of "right-to-travel" jurisprudence, shall decide the proper standard of review from the outset.

5. While the precise constitutional source of the right to travel has never been identified, the Supreme Court has made clear beyond doubt that the right exists and includes the right to migrate from one state to another. *See, e.g., Soto–Lopez,* 476 U.S. at 902–03 (noting that right has been inferred from federal structure of Government, and found variously in Article IV Privileges & Immunities Clause, Commerce Clause, and Fourteenth Amendment Privileges & Immunities Clause; but that "whatever its origin, the right to migrate is firmly established and has been repeatedly recognized by our cases.")

6. The "right-to-travel", jurisprudence is somewhat muddled, with the Supreme Court failing to mandate one approach to problems in this area. *See, e.g., Maldonado v. Houstoun,* 177 F.R.D. 311 at 322–23 (E.D.Pa.1997); Todd Zubler, *The Right to Migrate and Welfare Reform: Time for Shapiro v. Thompson to Take a Hike,* 31 Val.U.L.Rev. 893, 926 (1997). One area of confusion is whether the right to travel is analytically distinct from equal protection. *Id.* The Supreme Court has stated, however, that "[i]n reality, right to travel analysis refers to little more than a particular application of equal protection analysis. Right to travel cases have examined, in equal protection terms, state distinctions between newcomers and longer term residents." *Zobel v. Williams,* 457 U.S. at 61; *see also Soto–Lopez,* 476 U.S. at 904 n. 4 ("Of course, regardless of the label we place on our analysis—right to migrate or equal protection—once we find a burden on the right to migrate the standard of review is the same.").

This Court concludes that the right to travel should be not be analyzed separately from equal protection, but rather should be analyzed under the "fundamental right" prong of the equal protection doctrine. *See Fayerweather v. Narragansett Hous. Auth.,* 848 F.Supp. 19, 22 (D.R.I. 1994).

7. In *Soto–Lopez,* a four-vote plurality led by Justice Brennan announced that "[a] state law implicates the right to travel when it actually deters such travel ... when impeding travel is its primary objective ... or when it uses any classification which serves to penalize the exercise of that right." 476 U.S. at 903 (internal citations and quotation omitted). However, this test has never been applied by a majority of the Supreme Court, and its precedential value is unclear.

In any event, even assuming *arguendo* that this test should be applied, only the third element,

*ro,* 394 U.S. at 634. Precisely what constitutes a "penalty" is uncertain. In *Shapiro,* the Court found that denial of welfare benefits to newcomers for one year "penalized" their exercise of the right to migrate by denying them, on the sole basis of their status as newcomers, the "very means to subsist—food, shelter and other necessities of life." 394 U.S. at 627.

The Supreme Court has also found that states have "penalized" the right to travel where they have imposed a one-year residency requirement for voting rights, *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); imposed a one-year residency requirement for free non-emergency medical care for indigents, *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); and given extra points on the state civil-service exam to resident veterans who had been state residents on the date they entered military service, *Attorney General of New York v. Soto–Lopez,* 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (Brennan, J., for 4-vote plurality).

By contrast, the Court has found that one-year durational residency requirements have not "penalized" the right to travel where imposed as a precondition to lower tuition at state universities, *Vlandis v. Kline,* 412 U.S. 441, 452–53, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); or as a precondition to the ability to file for divorce in the state courts, *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). In addition, the Court has established that bona fide residency requirements, wherein individuals must live within a given political entity in order to enjoy a public benefit, but need not live there for any particular amount of time, do not raise constitutional concerns. *Memorial Hospital,* 415

U.S. at 255 (citing *Dunn,* 405 U.S. at 342 n. 13; *Shapiro,* 394 U.S. at 636); *see also Fayerweather v. Narragansett Hous. Auth.,* 848 F.Supp. 19, 22–23 (D.R.I.1994) (distinguishing bona fide residency requirements from durational residency requirements).

Several lower courts have recently examined the "penalty" issue with respect to statutes which deny newcomers full welfare benefits, but which differ in some way from the statutes at issue in *Shapiro. See Warrick v. Snider,* No. 94–1634, 1997 WL 875695 (W.D.Pa. Dec. 9, 1997); *Maldonado v. Houstoun,* 177 F.R.D. 311, (E.D.Pa.1997); *Roe v. Anderson,* 966 F.Supp. 977 (E.D.Cal.1997), *aff'd* 134 F.3d 1400 (9th Cir.1998); *Green v. Anderson,* 811 F.Supp. 516 (E.D.Cal.1993), *aff'd* 26 F.3d 95 (9th Cir.1994) (mem.), *vacated as moot,* 513 U.S. 557, 115 S.Ct. 1059, 130 L.Ed.2d 1050 (1995); *Mitchell v. Steffen,* 504 N.W.2d 198 (Minn.1993), *cert. denied* 510 U.S. 1081, 114 S.Ct. 902, 127 L.Ed.2d 93 (1994); *Davis v. Doth,* No. 62–C6–97–010231 (Minn.Dist.Ct.1997); *Brown v. Wing,* 170 Misc.2d 554, 649 N.Y.S.2d 988 (N.Y.Sup.Ct. 1996), *aff'd* 663 N.Y.S.2d 1025, 241 A.D.2d 956 (App.Div.1997) (mem.); *Aumick v.. Bane,* 161 Misc.2d 271, 612 N.Y.S.2d 766 (N.Y.Sup. Ct.1994); *Jones v. Milwaukee County,* 168 Wis.2d 892, 485 N.W.2d 21 (1992) *cf. Strong v. Collatos,* 593 F.2d 420 (1st Cir.1979) (holding Massachusetts' durational residency requirement for receipt of veterans' welfare benefits unconstitutional).

The Minnesota Supreme Court, in *Mitchell v. Steffen,* reviewed a statute which did not totally deny newcomers welfare benefits, but limited them for six months to sixty percent of the welfare benefits given to longtime residents, or to the amount the newcomers received in their prior state, or to Minnesota's full amount if the amount received in the

---

*i.e.,* the "penalty" question, is at issue in this case. Plaintiffs do not appear to contend that the durational residency requirement actually deters travel; indeed, the benefits that newcomers receive, although reduced by thirty percent, may still be greater than what they received in their state of origin.

In addition, while plaintiffs present persuasive evidence that one purpose of the requirement is to deter migration of indigents to Rhode Island, this cannot be deemed the statute's *primary* objective in light of the clearly stated legislative

intent. *See* R.I.Gen.Laws. § 40–5.1–2. The legislature has gone to great lengths to declare that the purpose of the statute is to encourage work and self-sufficiency among welfare recipients, and while the Court may look beyond this stated intent, it may not totally disregard it. *See Maldonado,* 177 F.R.D. at 328–31; *Warrick v. Snider,* No. 94–1634, 1997 WL 875695 at 8–10 (W.D.Pa. Dec. 9, 1997).

Thus, the focus remains on whether the durational residency requirement "penalizes" the exercise of the right to travel.

prior state exceeded Minnesota's full amount. *See* 504 N.W.2d at 199. The Court found that the proper mode of inquiry was to compare newcomers to longtime residents, and stated: " '[p]enalize,' as used in this context, does not mean ... to sanction or punish, but rather to suffer disadvantage, loss or hardship." *Id.* at 202. Thus, while Minnesota did not entirely deny benefits to newcomers, or even offer them less than what was available in their prior state, the statute did treat newcomers less desirably than longtime residents with respect to "payments for the basic necessities of life." *Id.* It thus "penalized" the exercise of the right to travel. *Id.* at 202–03.

Other courts have employed the same reasoning to find "penalties" in a California statute limiting newcomers for twelve months to benefit levels in their prior states, *Roe v. Anderson,* 966 F.Supp. 977; a post-*Mitchell* Minnesota statute limiting or denying various benefits to newcomers for twelve months, *Davis v. Doth,* No. 62–C6–97–010231 (Minn. Dist.Ct.1997); and a New York statute limiting newcomers for six months to benefit levels in their prior states, *Brown v. Wing,* 170 Misc.2d 554, 649 N.Y.S.2d 988.

Some courts have taken other paths to the same result. *See Warrick,* No. 94–1634, 1997 WL 875695 (W.D.Pa. Dec. 9, 1997); *Aumick v. Bane,* 612 N.Y.S.2d at 772. In *Warrick, supra,* the Court found that a Pennsylvania statute imposing a sixty-day waiting period for newcomers for cash benefits under the state's General Assistance Program was a "penalty" even though the statute provided newcomers with, *inter alia,* medical benefits and food stamps. The Court closely examined the benefits provided, and concluded that without the cash benefits denied under the durational residency requirement, the plaintiffs "run the very real risk of being homeless and without sufficient food or other basic necessities." *Id.* at 19.

In *Aumick,* the Court found a "penalty" in a New York statute that limited newcomers for six months to the greater of eighty percent of the otherwise available relief, or the benefit level in their prior states, because the actual purpose was to "penalize the exercise of the right to travel by creating a class of short-term residents, who would receive lower benefits than all others who also have met the same eligibility requirements...." 612 N.Y.S.2d at 772.[8]

Not all courts, however, have found that durational residency requirements for full welfare benefits "penalize" the right to travel. In *Maldonado,* the Court reviewed a Pennsylvania durational residency requirement limiting new residents for twelve months to the lesser of the amount of cash assistance received in their prior state or the full Pennsylvania benefit.[9] *See* 177 F.R.D. at 331–32. The Court focused on the fact that, while the statute denied newcomers the full cash welfare benefit, it did provide them with some cash, as well as medical benefits, food stamps, clothing for job interviews, and job training and transportation. The Court found that, unlike in *Shapiro,* newcomers to Pennsylvania were "provided the means of obtaining what is necessary for their basic sustenance and health...." *Id.* In addition, the Court noted that "the lower benefits provided do not make new residents any worse off because the new residents receive exactly what they were receiving or would have received in their state of prior residence." *Id.* Thus, there was no "penalty." *Id.*

The Wisconsin Supreme Court also employed a comparison with *Shapiro* in finding that a Wisconsin statute, requiring in-state residency for at least 60 consecutive days for general relief eligibility, was not a "penalty." *See Jones v. Milwaukee County,* 485 N.W.2d at 26. The Court found that "the 60 day waiting period at issue here is ... substantially less onerous than the one year waiting

**8.** The statute at issue in *Aumick* was essentially the same as the one later considered in *Brown v. Wing,* 170 Misc.2d 554, 649 N.Y.S.2d 988. The statute in *Aumick* expired by its own terms shortly after the *Aumick* decision was issued. *Brown,* 649 N.Y.S.2d at 990. The same terms were later made permanent, with the exception of the eighty percent limitation; hence the reconsideration in *Brown. Id.*

**9.** The durational residency requirement found to be a penalty in *Warrick v. Snider, supra,* was separate from that considered in *Maldonado.*

period of Shapiro ...", and noted the existence of several exceptions in cases of, *inter alia,* medical emergency, unusual misfortune, and prior Wisconsin residency. *Id.*

In the present case, plaintiffs argue that Rhode Island's durational residency requirement "penalizes" the right to travel because it deprives new residents of the ability to obtain the basic necessities of life, based solely on their status as new residents. Plaintiffs rely on detailed affidavits and testimony presented at the preliminary injunction hearing, illustrating their current financial predicaments.[10] They characterize their various situations as dire, and further cite cases indicating that a statute need not outrightly deny benefits to constitute a "penalty." *See, e.g., Memorial Hospital,* 415 U.S. at 260–62.

Defendant, meanwhile, doggedly counters that new residents are not denied "basic subsistence." She contends that "money for food and shelter has been provided to the parties at all relevant times and without any interruption or reduction, and their medical needs have also been met, without any regard to the duration of their residency." She maintains that the reduced cash benefit must be considered together with the various other benefits provided to new residents without restriction.[11] In her view, the overall effect is that despite the reduced cash benefit, new residents are not deprived of basic needs and thus are not "penalized" for exercising their right to move to Rhode Island. Notably, she does not contend that § 40–5.1–8(e) is simply a bona fide residency requirement.

It is clear to this Court that § 40–5.1–8(e) "penalizes" the exercise of the right to move to Rhode Island; the statute sends a clear message to such persons that they are un-worthy of the same treatment accorded long-time residents. *See, e.g., Shapiro,* 394 U.S. at 627; *Roe v. Anderson,* 966 F.Supp. at 983–84; *Mitchell,* 504 N.W.2d at 201–03. While not all durational residency requirements "penalize" the right to travel, the instant statute denies plaintiffs benefits needed to ensure their ability to procure basic necessities of life. *Id.* The Court need not delve into the minutiae of each plaintiff's financial situation to reach this conclusion; the durational residency requirement here applies by definition to those who the legislature has determined need governmental aid. It denies to one group of needy persons a significant amount of aid which they would otherwise receive, based on nothing more than their status as newcomers.[12]

It is of no moment that the statute does not necessarily leave new Rhode Island residents worse off than they would have been had they remained in their prior states of residence. *See, e.g., Roe v. Anderson,* 966 F.Supp. at 983–84; *Mitchell,* 504 N.W.2d at 201–02; *Brown v. Wing,* 649 N.Y.S.2d at 995. Indeed, newcomers may well fare better in Rhode Island than in their prior state. The relevant comparison, however, is between those who have been Rhode Island residents for more than twelve months, and those who have not. *Id.* The latter group is denied important benefits that the former group receives, based solely on the length of their residency. Herein lies the "penalty." *Id.*

Nor is it dispositive that new residents suffer only a reduction, rather than an outright denial, of benefits under the statute. *See Memorial Hospital,* 415 U.S. at 260–62; *Warrick v. Snider, supra; Brown v. Wing,* 649 N.Y.S.2d at 995. In *Memorial Hospital,* the Supreme Court found that providing

---

**10.** For example, plaintiff Monica Westenfelder submits that her annual cash benefit, at the reduced rate, is $3,768 while her weekly $75 rent totals $3,900 for one year. Thus, while she receives food stamps, her other expenses (*e.g.*, utilities, clothing for herself and her four-year-old son) are simply too great to keep up. She states that, if she received the full amount, she would have an extra $124 per month beyond rent to help pay these expenses.

**11.** Defendant cites DHS' provision to new residents of food stamps, medical assistance, emer-gency housing assistance, child care subsidies, job training, and job placement programs. In addition, she cites the availability of free "lifeline" telephone service, heating assistance, and the inability of utilities to terminate service for nonpayment of bills during the winter months.

**12.** For example, plaintiff Monica Westenfelder submits in her affidavit that her monthly cash benefit is reduced by $135 per month. This amount appears to be uncontested. Such an amount is no doubt significant to someone in a precarious financial position.

emergency medical care to newcomers did not compensate for depriving them of non-emergency care; while newcomers received *some* benefits, they were deprived of other important benefits provided to longtime residents. 415 U.S. at 260–62. Similarly, the unrestricted provision of non-cash benefits to new residents does not remedy the deprivation of significant amounts of cash assistance, again based solely on duration of residency. *See Memorial Hospital,* 415 U.S. at 260–62; *Warrick, supra; Brown v. Wing,* 649 N.Y.S.2d at 995.

Thus, this Court concludes that § 40–5.1-8(e) "penalizes" the right to travel, and strict scrutiny is proper. *See, e.g., Shapiro,* 394 U.S. at 634. Defendant claims that the statute furthers "the compelling state interest of reforming Rhode Island's welfare system and encouraging recipients to obtain financial independence through job training and employment opportunities."

 Encouraging welfare recipients to obtain work and end their dependence on governmental aid is indisputably a laudable goal. However, even assuming, *arguendo,* that it is a "compelling" state interest, defendant fails to demonstrate how a durational residency requirement for full cash benefits is narrowly tailored toward this goal.[13] *See Shapiro,* 394 U.S. at 637–38; *Warrick, supra,* at 21–22; *Maldonado,* 177 F.R.D. at 332–33. This Court cannot fathom how the act of providing full cash assistance to those Rhode Island residents with twelve months' tenure, while denying it to those without, is narrowly tailored toward encouraging welfare recipients to find work and achieve self-sufficiency. *Id.* Defendant provides no solution to this rather mystifying puzzle; she offers no evidence that newcomers are somehow less likely to seek work than longtime residents, or are able to make do with less.[14] *Id.*

Indeed, the Supreme Court has found that durational residency requirements for full welfare benefits, enacted in the name of encouraging work, do not even pass the relatively lax rational basis test. *See Shapiro,* 394 U.S. at 637–38; *see also Maldonado,* 177 F.R.D. at 332–33; *Warrick, supra,* at 21–22. The words of the *Shapiro* Court are particularly apt:

> [The State] suggests that the one-year waiting period is justified as a means of encouraging new residents to join the labor force promptly. But this logic would also require a similar waiting period for long-term residents of the State. A state purpose to encourage employment provides no rational basis for imposing a one-year waiting-period restriction on new residents only.

394 U.S. at 637–38. Clearly, then, the statute cannot pass the much more rigorous strict scrutiny test. *See Hooper,* 472 U.S. at 618; *Zobel,* 457 U.S. at 60–61.

Defendant also argues that the State has a compelling interest in reforming its welfare system and experimenting with various ways of doing so. This is indeed a legitimate purpose. In the present context, however, it is unclear what "reform" is involved other than discriminating against new residents; indeed, "reform" seems to be a mere euphemism for a variety of purposes long held to be either constitutionally impermissible or at least not compelling.

To that end, plaintiffs argue that the real purpose of the durational residency requirement is to deter migration of indigents to Rhode Island and to reduce welfare expenditures generally. That the statute is aimed at deterring migration seems "inherent in a two-tier benefit structure," which "affects only the benefits of new residents...." *Green v. Anderson,* 811 F.Supp. at 522 n.

---

13. The question here is not whether the entire Rhode Island Family Independence Assistance Act encourages welfare recipients to find work and become self-sufficient; it is whether the challenged *classification* does so.

14. The case of Monica Westenfelder is illustrative. She moved from Rhode Island to Massachusetts in April 1997, then back to Rhode Island in June. It is not clear why she would be any less motivated to seek work in June than she had been in April, or why she could make do with thirty percent less cash assistance in June than she had received in April.

14.[15] Defendant denies this, and with good reason; deterring migration of the poor, even those who specifically move to Rhode Island in search of higher welfare benefits, is a constitutionally impermissible purpose. *Memorial Hospital*, 415 U.S. at 263–64; *Shapiro*, 394 U.S. at 629–32.

Moreover, while the State has a legitimate interest in protecting the integrity of its welfare program by reducing overall expenditures, it may not do so by placing the burden on newcomers in order to "protect its own." *See Hooper*, 472 U.S. at 623; *Memorial Hospital*, 415 U.S. at 263; *Shapiro*, 394 U.S. at 633; *cf. Strong v. Collatos*, 593 F.2d at 423. As the Supreme Court stated:

> [t]he State may not favor established residents over new residents based on the view that the State may take care of "its own," if such is defined by prior residence. Newcomers, by establishing bona fide residence in the State, become the State's "own" and may not be discriminated against solely on the basis of . . . the date of residence.

*Hooper*, 472 U.S. at 623.

Thus, R.I.Gen.Laws § 40–5.1–8(e) is not narrowly tailored to serve any compelling state interest, and it cannot survive strict scrutiny.

Irrespective of the foregoing, Rhode Island's durational residency requirement also violates the Equal Protection Clause because it does not bear a rational relationship to a legitimate state purpose. *See Hooper*, 472 U.S. at 623; *Zobel*, 457 U.S. at 65; *Shapiro*, 394 U.S. at 637–38; *Maldonado*, 177 F.R.D. at 332–33; *Warrick, supra*, at 21–22; *Roe*, 966 F.Supp. at 983 (citing *Green*, 811 F.Supp. 516).

The Court need not linger long on this point in light of its discussion, *supra*, of the possible objectives, express and otherwise, of § 40–5.1–8(e). The Supreme Court's statement in *Shapiro, supra*, that a durational residency requirement does not rationally further the purpose of encouraging welfare recipients to seek work and achieve self-sufficiency, unmistakably applies to this case. *See* 394 U.S. at 637–38. Other courts have so held with respect to various durational residency requirements for full welfare benefits. *See Maldonado*, 177 F.R.D. at 332–33; *Warrick, supra*, at 21–22; *Roe*, 966 F.Supp. at 983 (citing *Green*, 811 F.Supp. 516). *But see Jones v. Milwaukee County*, 485 N.W.2d at 27 ("While it may well be true that the 60 day waiting period does not classify persons with perfection in that long time residents are not encouraged to seek employment to the exact same degree as newcomers, perfection or mathematical nicety is not required by the equal protection clause.")

Finally, both *Hooper* and *Zobel* indicate the inherently problematic nature of statutes which distinguish among bona fide residents solely on the basis of length of residence. *See Hooper*, 472 U.S. at 622–23; *Zobel*, 457 U.S. at 65. In both cases, the Supreme Court held that strict scrutiny was not even necessary based on the complete failure of the subject statutes to satisfy rational basis review. *See Hooper*, 472 U.S. at 618; *Zobel*, 457 U.S. at 60–61. Clearly, it is difficult to provide a rational basis for such a statute; "instances in which length of residence could provide a legitimate basis for distinguishing one citizen from another are rare." *Zobel*, 457 U.S. at 70 (Brennan, J., concurring). This case is not such an instance.

15. Plaintiffs have presented evidence tending to show that this is the case. For example, defendant, in a letter dated March 26, 1996, discussing "two-tiered" welfare systems, wrote:

> [T]he instituting of differential assistance benefits for recipients moving to Rhode Island from other jurisdictions continues to be of widespread interest. We have seen an increase of in-migration from other states over the last year, and many new recipients tell us the decision to move to Rhode Island was influenced by welfare reform initiatives in their home

state. Benefit levels may well be a factor in a decision to relocate. . . .
*Plaintiffs' Exhibit 3.*

In addition, Representative Pires, Chairman of the House Finance Committee of the Rhode Island General Assembly, which worked on the bill that became § 40–5.1–8(e), stated at the preliminary injunction hearing that the Committee was concerned that "there would be perhaps significance in migration which would have very significant costs. . . ." *Transcript* at 122–23.

■ This Court appreciates the complexities and practical difficulties of welfare reform, and recognizes the judicial deference to popularly elected legislatures inherent in rational basis review. *See Plyler v. Doe*, 457 U.S. at 216; *Dandridge v. Williams*, 397 U.S. at 485–86. Deference, however, does not equal abdication; where, as here, a classification is patently unsupported by a legitimate state purpose, the Court is obligated to say so. *See Hooper*, 472 U.S. at 622–23; *Zobel*, 457 U.S. at 65; *Shapiro*, 394 U.S. at 637–38.

■ In sum, R.I.Gen.Laws § 40–5.1–8(e) is unconstitutional, violating the Equal Protection Clause regardless of how one chooses to frame the "right-to-travel" analysis. Plaintiffs, thus, have an extremely high likelihood of success on the merits.[16]

### B. Irreparable Harm

Next, plaintiffs must establish that there exists the potential for irreparable harm to them if the injunction is denied. *Ross–Simons*, 102 F.3d at 15; *Kleczek*, 768 F.Supp. at 953. Plaintiffs contend that if they are denied an injunction, the hardships imposed upon them by the interim loss· of benefits would be incapable of remedy by a later judgment in their favor on the merits. In addition, plaintiffs note that even if such an award could somehow remedy the interim loss of benefits, the Eleventh Amendment would bar such retroactive monetary relief.

Defendant responds by pointing to each plaintiff's current financial condition, and concluding that "*no one* involved is hungry, ill, homeless or without medical coverage."

At the outset, plaintiffs are correct in their assertion that they need not demonstrate that they have already suffered irreparable harm; rather, they simply must demonstrate that the potential for such harm exists. *Ross–Simons*, 102 F.3d at 15.

That burden is met here. As noted *supra*, plaintiffs are individuals on the economic precipice. The particular amounts represented by the thirty percent reduction of aid under the durational residency requirement, *e.g.*, $135 to plaintiff Monica Westenfelder, are crucial to such persons, and the deprivation of these amounts works immediate hardships which cannot be remedied by a later judgment in their favor. In these circumstances, the bell cannot later be unrung.

> While the loss of money is normally not considered irreparable, this Court must point out that in this case those affected are not the average citizens but rather those who are in the grip of poverty. The loss to them of a certain sum of money each month is much more of an injury to them than it is to the average individual.

*Nelson v. Likins*, 389 F.Supp. 1234, 1237 (D.Minn.1974), *aff'd* 510 F.2d 414 (8th Cir. 1975) (mem.); *see also Chu Drua Cha v. Noot*, 696 F.2d 594, 599 (8th Cir.1982) ("For people at the economic margin of existence, the loss of $172 a month and perhaps some medical care cannot be made up by the later entry of a money judgment."); *Coalition for Basic Human Needs v. King*, 654 F.2d 838, 840–41 (1st Cir.1981) (where state was late in processing welfare checks, "irreparability of harm ... [was] excruciatingly obvious" de-

---

16. Plaintiffs initially made further arguments that need not be addressed here. First, they contended that, in addition to "penalizing" the right to travel and violating the Equal Protection Clause, the durational residency requirement violated the Privileges and Immunities Clause of Article IV, § 2, "as secured by" the Fourteenth Amendment. There is some support for using Article IV as the basis for deciding questions such as the present one. *See Soto–Lopez*, 476 U.S. at 920 (O'Connor, J., dissenting); *Zobel*, 457 U.S. at 73–74 (O'Connor, J., concurring in judgment). However, this approach has not been adopted by a Supreme Court majority, and the Court need not apply it here in light of the foregoing conclusions with respect to the Equal Protection Clause.

In any event, plaintiffs did not raise this argument in their post-hearing memorandum, and thus it is waived.

An additional argument appears to be that the durational residency requirement is not authorized by PRWORA, and is thus impermissible. The Court need not decide whether the durational residency requirement *violates* PRWORA, as this argument also appears to be waived. Clearly, however, any attempt by defendant to cite PRWORA as *justification* for the durational residency requirement would fail, as "Congress may not authorize the States to violate the Equal Protection Clause." *Shapiro*, 394 U.S. at 641.

spite availablity of food vouchers and emergency medical care); *Boddie v. Wyman*, 323 F.Supp. 1189, 1193 (N.D.N.Y.1970), *aff'd* 434 F.2d 1207 (2d Cir.1970), *aff'd* 402 U.S. 991, 91 S.Ct. 2168, 29 L.Ed.2d 157 (1971) (mem.) (instate geographic differentials for welfare benefits created potential for irreparable harm, because welfare benefits provide "means to qualified recipients to obtain essential food, clothing, housing and medical care."); *Brown v. Giuliani*, 158 F.R.D. 251, 264 (E.D.N.Y.1994) ("[L]oss of even a small portion of welfare benefits can constitute irreparable injury warranting issuance of a preliminary injunction.").

The irreparability of harm is further heightened by the fact that, even if the interim loss of benefits *could* be remedied by a a later judgment on the merits, an order of payment for benefits wrongly withheld would be precisely the kind of retroactive monetary relief barred by the Eleventh Amendment. *See Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Chu Drua Cha v. Noot*, 696 F.2d at 599; *Nelson v. Likins*, 389 F.Supp. at 1237. Thus, plaintiffs could not even take comfort in the knowledge that they would eventually receive the amounts wrongly withheld.

Finally, the interim violation of plaintiffs, constitutional rights, if an injunction is denied but the durational residency requirement is later found unconstitutional, is itself irreparable harm. *See Maldonado*, 177 F.R.D. at 332–33 ("Plaintiffs can demonstrate irreparable harm based on the sole fact that they will be deprived of their constitutional right to the equal protection of law in the absence of an injunction.").

This prong of the preliminary injunction test thus is met.

### C. Balance of Harms

Plaintiffs also satisfy the requirement that the injunction would not impose a hardship on the nonmovant outweighing that to the movant in the absence of an injunction. *Ross–Simons*, 102 F.3d at 15; *Kleczek*, 768 F.Supp. at 953.

Defendant asserts that the injunction would impose a hardship on her in the form of the extra money (at least $60,000 per month) that the State would have to pay to the families covered by the durational residency requirement. She submits that if an injunction issues, but the durational residency requirement is later upheld, the State would not likely succeed in recouping the amounts overpaid.[17]

These hardships are undeniable. Defendant may indeed face tremendous logistical difficulties in recouping overpayments, and may well fail to recoup a significant amount of such overpayments.

However, the potential harm to defendant quite simply does not rise to the level of the hardship faced by plaintiffs in the absence of an injunction. Recoupment is an existing remedy for defendant; the harm posed by its attendant difficulties, or even impossibility, pales in comparison to the harm, discussed at length *supra*, facing needy persons not only wrongfully forced to make do with less, but outrightly precluded from later recovery. *See Maldonado*, 177 F.R.D. at 333–34; *Nelson v. Likins*, 389 F.Supp. at 1237.

In any event, defendant's chance of prevailing on the merits is somewhere between slight and nil. Thus, this discussion is largely academic. An injunction should issue to prevent this unconstitutional harm from being perpetuated any further.

### D. The Public Interest

Finally, an injunction against the enforcement of § 40–5.1–8(e) will not adversely affect the public interest. *See Ross–Simons*,

---

**17.** She states that this is so because: (1) automated recoupment may be used only as long as families remain on assistance; (2) DHS cannot automatically reduce future monthly benefits by more than 10% of the family's standard monthly benefit; (3) DHS cannot recoup without complying with the procedural due process requirements for advance notice and hearing under R.I.Gen.Laws § 40–5.1–29 and the Rhode Island Administrative Procedures Act, R.I.Gen.Laws 42–35–1, *et seq.*; (4) DHS does not have a "readily available" right of setoff against recipients, benefits, family income, or family resources, but rather must seek general civil remedies; and (5) practically speaking, DHS is unlikely to recover from families who close their FIP case and move to another state.

102 F.3d at 15; *Kleczek,* 768 F.Supp. at 953. Actually, an injunction will promote the public interest here because the public as a whole has a predominant interest in seeing that the functions of government are conducted *lawfully* for the benefit of all citizens. Defendant offers only the assertion that the Court should not interfere with legislative experimentation regarding approaches to ending welfare dependency, and that the public interest is best served by giving Rhode Island's approach to ending welfare dependency a chance to work.

This is utterly unpersuasive. An injunction in this case will not prevent such experimentation, nor will it impede the laudable goals of legitimate welfare reform. It will merely prevent unconstitutional discrimination against newcomers to Rhode Island. The public interest strongly favors an injunction barring such discrimination, and ensuring that the needy receive the benefits to which, in the absence of § 40–5.1–8(e), the legislature has declared them entitled. *See Maldonado,* 177 F.R.D. at 333–34.

### IV. Conclusion

Because plaintiffs have satisfied the requirements for issuance of a preliminary injunction, their motion is granted. Defendant hereby is enjoined from enforcing R.I.Gen. Laws § 40–5.1–8(e), pending final resolution of this case on the merits. The Court need not rule on plaintiffs, request for provisional class certification at this time.

It is so ordered.