[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
The petition before the Court was brought by Blue Cross/Blue Shield of Rhode Island (BCBS) and (1) seeks review of a final decision and order of the Department of Business Regulation (DBR) pursuant to the provisions of the Administrative Procedures Act, G.L. § 42-35-15, and (2) requests declaratory and injunctive relief pursuant to the Declaratory Judgment Act, G.L. § 9-30-2.
 Facts and Travel
The record discloses that pursuant to the provisions of Public Laws, Chapters 330 and 567, as adopted by the 2004 General Assembly, a new §27-19.2-7 of the Rhode Island General Laws was enacted. That section in pertinent part reads as follows:
 (a) Pending appointment and confirmation of the health insurance commissioner, no compensation shall be paid to the board members by a nonprofit hospital or medical services corporation, excluding reimbursement for ordinary and necessary expenses. After such confirmation, the board must file application with the health insurance commissioner for approval of any proposed board compensation. Childcare, parking, transportation and other reasonable expenses for board members attending meetings shall be compensable.
As of the dates significant to this decision, the record discloses that no person had been appointed to or confirmed as the Health Insurance Commissioner.
The record further discloses that the Board of Directors of BCBS includes inter alia six (6) currently serving people who receive some form of no-cost BCBS coverage in conjunction with their services on the Board. Each of these six (6) Directors began his term of service prior to January 1, 2000. One of the Directors began his term of service prior to January 1, 1992. Prior to 1992, BCBS had a policy of providing its Directors with non-duplicative health insurance coverage during their active service and with respect to those members who served at least three (3) full terms, lifetime non-duplicative health insurance upon their retirement from BCBS. See Adm. Record at 3(A); 3(B). From time-to-time, beginning on January 13, 1993, the BCBS Board enacted changes to its policy with respect to health insurance for Board members. In October of 2000, the Board adopted a policy which provided life time BCBS coverage to then Board members and their eligible family members, both during their active membership and upon their retirement from the Board, for those persons who were Board members as of the date of the adoption of that policy, to wit, October 25, 2000. That policy further provided that BCBS members elected for the first time after the adoption of the policy would not be eligible for cost free health coverage during their service on the Board or thereafter upon their retirement. See Adm. Record at 3(F).
In October 2004, the Director of DBR issued a letter that called to BCBS's attention the provisions of the aforementioned newly enacted Chapters 330 and 567. That letter stated inter alia:
 "Providing no cost health and/or dental benefits to Directors constitutes the payment of compensation and the corporation is hereby ordered to cease providing such benefits at no cost to any and all Board members."
The letter further directed BCBS to provide evidence to DBR of its compliance by a date certain.
The original petition to the Superior Court in this matter was filed on or about October 25, 2004, apparently in direct response to the letter referred to and quoted from above. Shortly thereafter, BCBS, DBR and the Attorney General entered into a stipulation remanding the matter from the Superior Court to the DBR for formal hearing.
Submissions were filed with DBR, which included a waiver of a formal hearing as a result of which on or about December 23, 2004 the Decision and Order here appealed from issued reaffirming the conclusions of the letter quoted from above. That Decision and Order required BCBS to take certain action, including:
 "(1) to cease and desist from providing paid health and/or dental benefits to any members of the Board and/or from making any payments which would constitute payments of premiums for health and/or dental benefits on behalf of any member of BCBS's Board of Directors; (2) to forthwith seek re-imbursement from each member of the Blue Cross Board of Directors for whom Blue Cross paid for any health and/or dental benefits at any time on or after July 7, 2004, with the amount of said reimbursement to be equal to the full value of said health and/or dental benefits so provided. . . ."
At the conclusion of the hearings before this Court and pending this decision, a stay was entered with respect to the requirement that BCBS seek reimbursement as set forth in (2) above. However, the Court refused to stay the provisions of (1) above.
Petitioners' request for declaratory and injunctive relief is in substantial part directed at a constitutional challenge to the application of G.L. §27-19.2-7 to the factual situation that was found in the administrative proceedings before DBR and, to the extent that the factual situation found by the Court may differ from that of the administrative proceedings, to the facts here found. In order to set this matter in proper context, the Court will first outline its understanding of the evolution of the Directors' health benefits (health insurance coverage).
 1. On July 14, 1988 the Board of Directors of BCBS voted to approve certain actions and recommendations of its Personnel Committee at a meeting held on June 22, 1988. Those actions and recommendations were to provide Directors with "non-duplicative health insurance coverage that would continue for the duration of the Director's active service." Appropriate coverage was to continue after retirement from the Board provided that the retiring Director had served three full terms.
 2. In January 1993, that part of the policy was modified slightly so as to provide for retiree contribution to the cost of such insurance predicated on years of service on the Board. This modification inter alia, grandfathered any then serving Director who was on the Board prior to January 1992 and who retired after serving three or more terms on the Board. As indicated above, one of the six (6) Directors implicated in this proceeding began his unbroken time of service prior to January 1992.[1]
 3. In the spring of 1999, certain actions and recommendations of a Board ad hoc committee were approved and adopted by the Board keyed to a so-called change in control of the corporation.[2]
Essentially, these resolutions provided for vesting of health insurance benefits for all Directors immediately prior to a change in control. See Adm. Record at 3(C)-(D).
 4. The Administrative Record at 3(E) is a policy review statement of health and dental insurance coverage for Directors of the BCBS Board of Directors as it existed in November 1999.
 5. The Administrative Record at 3(F) is an amended policy statement for Directors as of October 15, 2000 (revised as of April 2001), which inter alia approved extending lifetime health insurance coverage to the then current members and spouses/eligible family members of the Board. See Adm. Record at 3(G).
 6. Of further significance to the issue before the Court, on October 15, 2000, the Directors' minutes reflect that among other recommendations approved at this meeting was one to compensate the members of the Board. Apparently, this recommendation was implemented in June 2001. See Adm. Record at 3(G).
 7. In June 2001, a Board reimbursement procedure document reflected that "the monetary value of the Directors Health Care premiums will be deducted from the quarterly retainer payment, but will be included in the form 1099 reported to the IRS." Adm. Record at 3(H).
 8. As of July 2001, the Board approved payment of compensation to Board members. New members did not receive fully paid health benefits. Those who were members as of October 15, 2000 (the six (6) interveners), received fully paid health insurance for life, and the difference between the value of their insurance policy and the compensation amount in cash (the Board voted to discontinue retainers and stipends to its Directors on April 29, 2004 for a sixty-day period). The Court has no knowledge as to what subsequent votes incident thereto may have occurred, or as to the present status of compensation payments; however, as indicated above § 27-19.2-7(a) directly dealt with that issue.
An additional fact of consequence in connection with the case at bar is that BCBS is a charitable corporation created pursuant to G.L. § 27-19-1 et seq. and § 27-20-1
et seq. and is subject to the Rhode Island Non-Profit Corporation Law § 7-6-1 et seq. which authorizes Boards of Directors of such corporations to award themselves compensation. See § 7-6-5-(11).
 Declaratory Judgment: Contract Clause
The primary thrust of BCBS's argument and complaint is that it is contractually bound to provide no-cost health and/or dental benefits to the six (6) Directors and that the enactment of § 27-19.2-7, and its application to the existing situation as to the Directors, would represent an unconstitutional impairment of contract in that such section fosters no significant and legitimate public purpose. Furthermore, BCBS argues that the equal protection provisions of the United States and Rhode Island Constitutions are violated here because of the application of the statute to current but not to retired Board members. The Directors argue that the statute is unconstitutional because it results in a governmental taking without due process of law.
The Court will address these three constitutional arguments pursuant to its power to interpret statutes under the Declaratory Judgments Act. Moore v. Langon,92 R.I. 141, 160, 167 A.2d 588, 567 (1961). The Uniform Declaratory Judgments Act vests the Court with "the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." R.I.G.L. 1956 § 9-30-1. In so doing, the Court strives "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Sec. 9-30-12; see also CapitalProperties, Inc. v. State, 749 A.2d 1069, 1080 (R.I. 1999). "A decision to grant a remedy under the Uniform Declaratory Judgments Act is purely discretionary."Woonsocket Teachers' Guild Local Union 951, AFT v.Woonsocket School Comm., 694 A.2d 727, 729 (R.I. 1997). "Thus, even if the complaint contains a set of facts which bring it within the scope of our Declaratory Judgments Act, there is no duty imposed thereby on the Court to grant such relief, but rather the Court is free to decide in the exercise of its discretion whether or not to award the relief asked for." Employers' FireIns. Co. v. Beals, 103 R.I. 623, 628, 240 A.2d 397, 401
(R.I. 1968).
Article I, § 10, Clause 1 of the United States Constitution provides that "no state shall . . . pass any bill of attainder, ex post facto law or law impairing the obligation of contracts." Similarly, Article I, section 12 of the Rhode Island Constitution, states that "no ex post facto law or law impairing the obligation of contracts shall be passed."[3] Both Constitutional provisions limit the power of this state to regulate private contracts. Brennan v. Kirby,529 A.2d 633, 637 (R.I. 1987). Despite the seemingly absolute bar to impairment, the United States Supreme Court has refused to read the language with literal exactness. Id. Indeed, the proper analysis is merely a rational basis review. In other words, the statute will be held as not violating the Contracts Clause so long as it is reasonable and necessary to carry out a legitimate public purpose. Id. The underlying rationale for departing from the literal language of the Contracts Clause is that "literalism in the construction of the [C]ontracts [C]lause . . . would make it destructive of the public interest by depriving the State of its prerogative of self-protection." Allied Structural Steelv. Spannaus, 438 U.S. 240 (1978).[4]
A prerequisite to a Contracts Clause analysis is a finding that there was a valid contractual relationship between the parties.[5] Parella v. Retirement Bd. ofthe R.I. Employees' Retirement System, 173 F.3d 46, 59
(1st Cir. 1999). As stated before, BCBS and the intervening Directors aver that they now have and have had, at least since 2000, a contractual relation whichinter alia provided for the provision by BCBS of fully paid health insurance for life. The State's rejoinder to this argument suggests that, in fact and in law, there is no contract but rather a simple unilateral act of the members of the Board voting to afford benefits to certain members of the Board.
The Court questions whether a contract exists in this case. The Board was authorized, at the time, to compensate itself. R.I. Gen. Laws 7-6-5 (11); BCBS Bylaws effective February 7, 2002, Art. 3, § 11. In 2000, the Board passed a resolution to provide health insurance for life to its members. The issue is whether a contract was formed as a result of the Directors' vote. After a thorough review of the law, the Court is unable to cite any case or treatise that adequately addresses this issue.
BCBS has burden of proving, by a preponderance of the evidence, that there was a contract. See Anderson v.Liberty Lobby Inc., 477 U.S. 242, 267 (1986) (Brennan, J., dissenting) (in dicta: plaintiff has burden of proving the existence of a contract by a preponderance of the evidence); In re Ewing, 39 B.R. 59, 60 (D.R.I. 1984) (burden of proving existence of a contract is on the party alleging the existence of a contract). The Petitioners advance various arguments in support of a contract, each of which will be addressed in turn. BCBS's Memorandum in Support of its Motion for a Temporary Restraining Order and Injunctive Relief, does not present evidence, but rather makes the conclusory statement that a contractual relationship exists between the Directors and BCBS. BCBS cites to McGrath v. RhodeIsland Retirement Board, 88 F.3d 12 (1st Cir. 1996) as supporting its position but the Court does not find that case relevant. McGrath stands for the proposition that retirement plans, and more specifically, a legislatively enacted, Rhode Island employee retirement plan, are within the reach of the Contracts Clause. 88 F.3d at 17-18. The Court fails to see how McGrath dictates finding a contract in this case. The health care benefits at issue here are not the equivalent of a retirement plan, which a majority of courts have held creates an implied in fact unilateral contract. McGrath 88 F.3d at 17. "A retirement program has become a basic part of an employee's remuneration even as his wages are a part thereof, and a consideration flows to the employer as well as to the employee through such a program. Cantorv. Berkshire Life Ins. Co., 171 NE.2d 518, 522 (Ohio 1960). BCBS has not presented evidence that any of the Directors expected that in return for serving on the Board they would have health insurance while on the Board or when they retired. The fact that some of the Directors were eligible to receive the benefit after they retired does not make it equivalent to a retirement plan.
In BCBS's Reply Memorandum in Support of its Motion for Temporary Restraining Order and Injunctive Relief, it argues that the vote to confer health insurance was a valid action of the Board and as such creates a binding contract on the corporation. BCBS cites no law in support of this assertion. Rather, the independent research of the Court reveals that although an action of the Board may create a binding contract, a contract does not arise as a matter of law. Indeed, all the elements of contract formation must be present. See, e.g. FobianFarms v. Gateway Coop., 2002 Iowa App. LEXIS 11 (Iowa Ct. App., 2002) (minutes of board, although containing all material terms, did not specifically express intent to be the completion of an agreement and so was not an express contract for purposes of statute of limitations); Crawford v. City of Pocahontas,
1985 Ark. App. LEXIS 1731 (Ark.Ct.App., 1985) (even though the minutes of a council meeting might be sufficient to constitute a written contract, the minutes at issue lacked essential terms and did not constitute a written contract); cf. Brampton Woolen Co. v. Commissioner,45 F.2d 327, 329 (1st Cir., 1930) (Wilson, J. dissenting) ("Obviously, directors cannot technically contract with themselves; but it is well settled that when, as in this case, the directors, or a majority thereof, are also the executives and managing forces of the corporation, they may informally agree for reasonable compensation for their services rendered to their corporation.").
A valid contract requires competent parties, subject matter, legal consideration, mutuality of agreement, and mutuality of obligation. Rhode Island Five v. MedicalAssoc's of Bristol County, Inc., 668 A.2d 1250, 1253
(R.I. 1996). Mutuality of obligation refers to reciprocal promises that legally bind two parties.Crellin Tech., Inc. v. Equipment Lease Corp., 18 F.3d 1,7-8 (1st Cir. 1994). In contrast, an illusory promise is one which contains words which form a promise that is conditioned on "some fact or event that is wholly under the promisor's control and his bringing it about is left wholly to his own will and discretion." Vickers Antonev. Vickers, 610 A.2d 120, 123 (R.I. 1992). With respect to mutuality of obligation, the Court is particularly troubled by the fact BCBS reserved the right to amend or terminate the insurance coverage at any time. Article VIII of the Plan, entitled Amendment and Termination, states that BCBS "has the right, subject to the terms of any Policy, to make any amendment to this Plan at any time and retains the right to terminate this Plan at any time."[6] BCBS's reservation of the right to unilaterally terminate its obligation to provide health insurance at its sole will and discretion belies mutuality of obligation and consequently, the existence of a binding contract.
BCBS argues that the promise to provide health insurance was not illusory because within the same section of the Plan that is cited to by DBR, the right to amend or terminate the health insurance is limited by the provision that states that the Directors could only amend or change the policy "according to the financial viability of the Corporation." Notably, none of the documents submitted to the Court by the Petitioners elucidate the meaning of the phrase "financial viability." It is the opinion of the Court, that the Policy Statements that allow the Board to change the health insurance policy "according to the financial viability of the corporation" is no less illusory than the Plan documents that allow BCBS to make amendments or terminate the policy "at any time."
Perhaps addressing the question of mutuality of obligation, BCBS argues in its Reply Memorandum in Support of its Motion for a Temporary Restraining Order and Injunctive Relief, that a contract exists on the theory of detrimental reliance. Allegedly, the Directors relied on the October 2000 policy and remained on the Board and received a reduced stipend, instead of retiring after the end of the term and receiving health benefits without any further service to the Board. To prevail on a claim of promissory estoppel, the Petitioners must prove (1) a clear and unambiguous promise, (2) reasonable and justifiable reliance on the promise and (3) detriment to the promisee caused by his reliance on the promise. Filippi v. Filippi, 818 A.2d 608,626 (R.I. 2003). BCBS's promissory estoppel argument fails because, once again, the Court is not persuaded that anything other than an illusory promise was made to the Directors. Additionally, the Court is not convinced that the Directors or BCBS suffered a detriment, because whether or not § 27-19.2-7 applies to retirees has not yet been resolved. It may be that the retirees who currently receive health insurance are in violation of the statute and will have to repay the value of the benefit received.
Lastly, in its memorandum on the merits, BCBS argues that the Directors have employment contracts with the corporation. The contracts, BCBS argues, are based on either the 1988 Policy or the 1993 Policy, depending on when the Director was hired, and the 2000 Policy, which applies to all Directors equally. BCBS does not present any other evidence which indicates that the corporation and the Directors agreed to enter into an employment contract. The Court does not concur with BCBS's analysis. As a general proposition, directors are distinguishable from employees. Directors are traditionally employer rather than employee positions unless they perform traditional employee duties. Chaverov. Local 241, Division of Amalgamated Transit Union,787 F.2d 1154, 1157 (7th Cir. 1986). There is no evidence that the Directors performed any additional duties other than the regular, ordinary duties of a Director. Furthermore, BCBS's assertion that the policies formed an employment contract is negated by Article VI of the 2000 Plan, entitled, Non Guarantee of Employment the Plan, which provides that "nothing contained in this Plan shall be construed as a contract of employment between [BCBS] and any Board Member. . . ." BCBS's position that the Plans created an employment contract is further undercut by the fact that the Directors received a Form 1099-MISC (director's fees and remuneration) for tax purposes rather than a Form W-2, which is received by employees.
While doubtful that a contract was ever formed between the Directors and BCBS, because of the lack of authority on the issue, the Court will continue the Contract Clause Analysis, assuming arguendo that a contract was formed. That said, the Court holds that § 27-19.2-7 is constitutional because it is reasonable and necessary to carry out a legitimate public purpose.
After finding that a contract exists, as we assume here, the next step in the Constitutional analysis is to determine whether the statute substantially impairs said contract. McGrath, 88 F.3d at 16. Determining the extent of impairment requires inquiring into whether the industry, into which the complaining party has entered, has been regulated in the past. Energy Reserves Group,Inc. v. Kansas Power and Light Co., 459 U.S. 400, 411
(1983). The United States Supreme Court has long observed that "one whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them."Id. The Court agrees with the Attorney General and the DBR that BCBS, and the health insurance industry in general, is one of significant regulation. In fact, BCBS, a non-profit medical service corporation, derives its very existence purely from its own statute, distinct from the general non-profit corporation act. See
R.I.G.L. § 27-20-2; § 7-6-1. The Court acknowledges the Petitioners' argument that § 27-19.2-7 totally deprives the Directors of all compensation, thus substantially impairing any contract that may have existed. EnergyReserves, 459 U.S. at 411 ("The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected."). Nevertheless, the Court is persuaded that the degree of regulation that has existed since the creation of BCBS, and the uniqueness of BCBS's business, mitigates against a finding of wrongful substantial impairment.
The Petitioners also argue that although BCBS may be heavily regulated, the Directors' compensation was never regulated. The Court rejects this argument. In EnergyReserves the United State Supreme Court noted that "at the time of the execution of these contracts, Kansas did not regulate natural gas prices specifically, but its supervision of the industry was extensive and intrusive." 459 U.S. at 414. This Court likewise does not feel constrained by the fact that compensation per se was never heretofore regulated because the reality is that BCBS is a creature of special legislation in an industry that is extensively regulated. Hospital ServiceCorp. of Rhode Island v. West, 112 R.I. 164, 178-79,308 A.2d 489, 497 (1973) ("Because of the substantial differences between nonprofit hospital and medical service corporations and commercial insurance carriers the Legislature, in the exercise of the police power, may classify nonprofit corporations such as petitioners as separate from commercial insurers and may confer upon an administration officer the right reasonably to regulate the affairs of such corporation."). Even if a contract existed, it would "carry with it the infirmity of the subject matter." Allied Structural Steel,438 U.S. at 242.
The final step in the constitutional analysis is to examine whether the statute was a reasonable and necessary means of achieving a legitimate public purpose. As the Supreme Court said in Allied StructuralSteel,
 "It is settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected." 438 U.S. at 242.
This power is known as the state's police power and is an "exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals." Id. However, the state's police power is not unlimited. Id. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." EnergyReserves, 459 U.S. at 413.
In the case at bar, the Court finds that the Legislature enacted reasonable and necessary means of achieving a legitimate public purpose. The evidence for this conclusion can be found in the legislative findings of § 27-19.2-1 found in R.I. Pub. Laws Chapter 330 and 567:
 "The general assembly finds and declares that it is in the best interests of the resident of Rhode Island: (1) to strengthen and reform the governance structure of nonprofit hospital service and/or medical services corporations; (2) to ensure a diverse, independent and publicly accountable board of directors; (3) to prohibit certain activities which may allow self-interest to compromise undivided loyalty to the public interest mission for which such corporations are established; and (4) to require adoption of principles and procedures to keep such corporations aligned with their public interest mission."
The Court is bound to pay due deference to its co-equal branch of government, the Legislature, and is satisfied, given the findings of fact above, that the prohibition on compensating BCBS Directors was reasonable and necessary. Energy Reserves, 459 U.S. at 412 ("Unless the State itself is a contracting party, `as is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'") (internal cites omitted.)
In concluding this section, the Court reiterates its findings on the matter. First, the Court finds that no contract between BCBS and its Directors exists. Second, assuming a contract exists, the statute at issue does not substantially impair contractual rights. Third, assuming that contractual rights were impaired, § 27-19.2-7 is a reasonable and necessary use of the state's police power to achieve the legitimate public purposes stated in the Legislative findings.
 Declaratory Judgment: Equal Protection
Under the Constitution of the United States, all persons within the jurisdiction of a state are entitled as of right to equal protection of its laws. U.S.C.A. Const. Amend. 14, § 1; McCoy v. Providence Journal,190 F.2d 760, 764 (1st Cir. 1051). The fundamental mandate of the equal protection clause is that similarly situated persons should be treated alike. Westenfelder v. Ferguson, 998 F.Supp. 146, 150 (D.R.I. 1998). However, within this basic precept, legislatures must be free to do their work, which at times requires drawing distinctions between individuals.Id. In determining whether § 27-19.2-7 complies with equal protection standards, the Court must examine the nature of the classification established by the statute and the nature of the individual rights which may be violated. Kennedy v. State, 654 A.2d 708, 712 (R.I. 1995). Two varieties of statutory classifications are presumptively invidious, for purposes of the equal protection clause, and require additional judicial scrutiny: (1) those which distinguish among individuals based on a "suspect" classification, and (2) those which distinguish among individuals in a manner that impinges upon a fundamental right.Westenfelder, 998 F.Supp. at 151. Regulations dealing with economic or social matters or affecting nonfundamental rights are evaluated under rational basis test and will be upheld unless shown to bear no rational relationship to constitutionally permissible state purpose. Felice v.R.I. Bd. of Elections, 781 F.Supp. 100, 105-06 (D.R.I. 1999); City ofPawtucket v. Sundlun, 662 A.2d 40, 60 (R.I. 1995) (if equal protection challenge does not involve a suspect class or fundamental right then appropriate standard of review is minimal scrutiny). Thus, the role of courts in reviewing legislation alleged to violate equal protection is generally a deferential one, and courts do not second-guess wisdom or efficiency of state action, but merely seek to insure its rationality.Westenfelder, 998 F.Supp. at 151.
The Petitioners rightfully acknowledge that the proper level of scrutiny in this case is minimal because neither a suspect class nor fundamental right is implicated by § 27-19.2-7. Indeed the statute is plainly social or economic in nature. The Court agrees with the Petitioners' frank summation that, "the track record for rational relationship Equal Protection Clause challenges to legislation evoke Matthew 22:14's admonition that `[f]or many are called but few are chosen." Such is the case at bar.
The Court notes that § 27-19.2-7 is facially neutral. Its terms do not create classifications nor does the plain language implicate a classification. The statute simply states that Board members of a nonprofit medical services corporation may not receive compensation until a Health Insurance Commissioner is engaged. The Petitioners argue that the DBR has interpreted the statute as not applying to retired Directors, thus treating retired Directors differently than active Directors. The DBR denies this allegation, contending that it has not yet reached the issue of whether retired Directors are entitled to health insurance benefits. The Court is not persuaded by the Petitioner's argument. Not only does the statute not afford different rights according to classification, the Court has not found unequal application of the law by DBR. Even if the DBR never pursues the issue regarding the retired Directors, that alone would not be a basis for finding denial of equal protection. Felice, 781 F.Supp. at 106. Failure to achieve the goal of perfectly consistent administration of the law in a particular case does not necessarily constitute equal protection violation rendering the law unenforceable. Id.
Furthermore, the Court finds that § 27-19.2-7 is rationally related to a legitimate public purpose. As noted above, the Court is deferential to the factual findings of the Legislature and the Legislature's discretion to fashion remedies to address social ills. The presumption that §27-19.2-7 is reasonable and necessary has not been rebutted by the Petitioners. In fact, the statute is imminently reasonable given the fact that it only affects compensation as of July 7, 2004, (as opposed to retroactive application); only negatively affects six (6) Directors; and will promote the welfare of the general public by ensuring that BCBS is operated in accordance with its greater public mission.
 Declaratory Judgment: Due Process
The Petitioners' Due Process arguments, like their Contract Clause argument, are premised on the existence of a contract between BCBS and the Directors. They contend that the contract gives rise to a vested property interest, which cannot be abridged without due process. The Petitioners liken their expectation of receiving life-long health insurance upon leaving the Board to the expectation that employees have in receiving a pension. As noted above, the Court does not find the present scenario analogous to the pension fund line of cases.
The Fifth and Fourteenth Amendments of the United States Constitution guarantee that no person shall be deprived of life, liberty or property by the government without due process of law. Substantive due process is distinguishable from procedural due process. "Substantive due process addresses the essence of state action rather than its modalities."Jolicoeur Furniture Co., Inc. v. Baldelli, 653 A.2d 740, 751 (R.I. 1995) ("such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible"). The Petitioners do not delineate their arguments as relating specifically to either substantive due process or procedural due process, hence, this Court will address both.
Whether the protections of Due Process apply depends on the nature of the interest being infringed. Board of Regents v. Roth, 408 U.S. 564,570-71 (1972). In this case the Petitioners claim an alleged property interest. Constitutionally protected property interests may take many forms. Although the United States Supreme Court has "eschewed rigid or formalistic limitations" it has also recognized certain boundaries less the concept of property be stripped of all meaning. Id. at 576. Some recognized property interests include statutory entitlements, Mathews v.Eldridge, 424 U.S. 319 (1994), workers' compensation benefits, State exrel: Haylett v. Ohio Bur. Of Workers' Comp., 720 N.E.2d 901 (1999), and vested rights in deferred compensation from an employer, otherwise known as pension benefits, Matter of Almeida, 611 A.2d 1375, 1385 (R.I. 1992). Although neither the United State Supreme Court nor the Rhode Island Supreme Court have developed a bright line test for what constitutes property for the purposes of Due Process, prior case law has identified certain "attributes" of constitutionally protected property interests.Roth, 408 U.S. at 577.
 "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." Id.
Because vested rights in a pension have been held to be property, the Petitioners labor to equate the BCBS health insurance policy with pension benefits. This is not a fair analogy. No court has recognized that such a fringe benefit is due constitutional protection. Additionally, the Petitioners have not demonstrated a legitimate claim of entitlement or reliance. Unlike a typical pension case, the Directors are not employees who have worked upwards of 20 years with the expectation that they would receive a pension. The Petitioners have not submitted a single affidavit from the Directors that state that they became a Director with the expectation that they would receive health insurance.
Furthermore, as demonstrated above, the Petitioners cannot claim a property interest created by contract.Cf. Perry v. Rhode Island, 975 F. Supp 418, 427
(D.R.I. 1997) (clerks unsuccessful in claiming that incentive pay statute created contractual property interest). Rather, the 2000 Policy at most created a unilateral expectation in health insurance benefits because the explicit terms of the Policy allowed for amendment or termination at the discretion of the Board. The Board did not make binding promise such that the Directors could reasonably rely on the prospect of receiving health insurance benefits in perpetuity. Cf.Perry, 975 F.Supp. at 426 (no vested right to incentive pay because statutory language suggested that the Legislature reserved the right to change the compensation as it saw fit). Because the Court finds no contract, it happily defers discussion of whether the Directors' eligibility under the Policy constitutes not only a property interest but a vested interest.
Section 27-19.2-7 is clearly legislation directed to address the social welfare of the state. "Economic or social welfare legislation carries a presumption of validity and will be upheld against substantive due process challenges so long as the law bears rational relation to legitimate governmental objectives."Hargreaves v. Reis, 977 F.Supp. 123, 129 (D.R.I. 1997) (citing U.S. v. Carolene Products Co., 304 U.S. 144
(1938)). "In regard to whether rational relationship exists between a statute and legitimate governmental objective, standards applicable to economic legislation under due process clause are less exacting than limitations imposed on states by contract clause."Liberty Mut. Ins. Co. v. Whitehouse, 868 F.Supp. 425,434 (D.R.I. 1994). In other words, "economic legislation that does not implicate fundamental rights is unconstitutional under due process clause only if it is arbitrary, discriminatory, or demonstrably irrelevant to policy legislature is free to adopt." MetropolitanProp. Cas. Ins. Co. v. R.I. Insurer's InsolvencyFund, 811 F.Supp. 54, 57 (D.R.I. 1993).
It is the Petitioners' burden to rebut the presumption that the statute is constitutional and to establish that the legislature has acted in an arbitrary and irrational way. Liberty Mutual, 868 F.Supp at 434 (quoting Useryv. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976)). "In determining whether that burden has been met, the relevant inquiry is "whether a rational relationship exists between the statute and a legitimate governmental objective." Id. In this case, the Legislature took pains to document the objectives it sought to achieve through the enactment of § 27-19.2-7. Striving to ensure that BCBS is not mismanaged due to the self interests of the Directors and to reform BCBS so as to be aligned with its public interest mission is indisputably a legitimate governmental objective. Furthermore, suspending the Directors' compensation until an objective third party, e.g. the Insurance Commissioner, can oversee such compensation is not irrationally related to the aforementioned objectives. The Petitioners have not demonstrated that the Legislature acted arbitrarily or irrationally.
Procedural due process, which is said to mean fair procedure, is a flexible standard, which varies depending on the nature of the interest affected and circumstances of the deprivation. Gorman v. University of R.I.,837 F.2d 7, 12 (1st Cir. 1988). However, the protections of Due Process are not triggered unless a party can show that it has been deprived of protectable liberty or property interest. Fireside Nissan, Inc. v. Fanning,30 F.3d 206, 219 (1st Cir. 1994). "The property interest is created and dimensions defined by existing rules or understandings that stem from an independent source such as state law." Id. If the Court concludes that a particular interest falls within the Due Process clause, the Court will then gauge whether the existing procedures are adequate by engaging in a balancing test, which consists of weighing various factors, to include:
 "The private interests affected by the state's existing procedures, risk of erroneous deprivation under them, probable utility of additional or substitute procedures and the government's interest in maintaining existing procedures, keeping in mind financial and administrative burdens of additional or substitute procedures." Lee v. State, 942 F.Supp. 750, 755 (D.R.I. 1973).
Again, there is a presumption in favor of the Legislature's use of its police powers. "Where legislature enacts general legislation eliminating statutory rights or otherwise adjusting the benefits and the burdens of economic life, in the absence of any substantive constitutional infirmity, the legislative determination provides all the process that is due."Hoffman v. City of Warwick, 909 F.2d 608, 619-20 (1st
Cir. 1990). The Court will not repeat its analysis regarding whether the Petitioners have a protectable property interest. For the reasons stated above, the Court holds that the Petitioners do not have such an interest. However, even if the situation were otherwise, the Court believes that the general rule enunciated in Hoffman establishes that the Petitioners were afforded procedural due process. The Court is mindful that the very existence of BCBS and the Directors' authority to receive compensation is derived from statute. Thus, by enacting § 27-19.2-7, the Legislature adjusted the benefits and burdens of economic life as it relates to BCBS subscribers and its Directors. The legislative determination that § 27-19.2-7
was necessary for the welfare of the state, the due process afforded the Petitioners through an administrative hearing before the DBR, and a final determination by this Court evinces an abundance of procedural due process afforded to the Petitioners.
 Administrative Appeal
The Petitioners appeal the decision of the DBR, which held that health insurance benefits were compensation as contemplated under § 27-19.2-7. The Petitioners do not dispute DBR's factual findings, rather, they contend that the agency misconstrued the word compensation. Statutory construction is a legal question, however, the Court will not engage in a de novo review. "When an administrative agency interprets a regulatory statute that the General Assembly empowered the agency to enforce, a court reviewing the agency's interpretation of the statute as applied to a particular factual situation must accord that interpretation `weight and deference as long as that construction is not clearly erroneous or unauthorized.'" Labor Ready Northeast,Inc., v. McConaghy, 849 A.2d 240, 344 (R.I. 2004). It is black letter law that when the statutory language is unambiguous, it must be given its plain and ordinary meaning. Id. at 345. But where the language is ambiguous, "the construction given by the agency charged with its enforcement is entitled to weight and deference as long as that construction is not clearly erroneous or unauthorized." Id.
Section 27-19.2-7 prohibits Directors of BCBS from receiving compensation, however, the statute does not define compensation. Rather, it includes a list of what is not prohibited by the statute. R.I.G.L § 27-19.2-7
(Childcare, parking, transportation and other reasonable expenses for Board members attending meetings shall be compensable). Therefore, compensation is arguably ambiguous and the DBR's interpretation must be given weight and deference. The Court finds that the DBR's conclusion that health insurance was compensation for purposes of § 27-19.2-7 is not clearly erroneous. Its decision was informed by the fact that BCBS itself referred to the health benefits as compensation. It was included in the annual statements as part of its supplemental compensation exhibits. Adm. Record at 9(A)-(C). When the Board voted to compensate itself in 2000, the value of the health insurance was deducted from the monetary compensation received. Admin Record at 3(H) Additionally, the value of the health insurance was included as income and reported on the IRS Form 1099-MISC.
The Petitioners argue that compensation should be defined as consideration for an expected benefit. In support of this assertion the Petitioners point to other areas of legislation where compensation has been used synonymously with consideration. For example, in § 11-18-31, the statutory definition of a "professional solicitor" is one who solicits for "compensation or other consideration." The Court declines the Petitioners' invitation to impose a narrow definition on the term compensation by referencing other statutory provisions. In Labor Ready, the Supreme Court made it clear that if the Legislature wanted to define a term so that it carried the same meaning throughout the General Laws, it could have so specified. 849 A.3d at 347 (if the General Assembly intended that instrument mean "negotiable instrument" for purposes of a check cashing statute, it could have said as much by defining the term narrowly as it did in the commercial code).
The Petitioners also argue that the Court should construe compensation in a way that does not make the statute unconstitutional. This argument is clearly based on the Petitioner's earlier constitutional arguments. As the Court has found that § 27-19.2-7 is constitutionally sound, the Petitioner's final argument must fail.
 Conclusion
The Court rules in favor of the Respondents on all counts. Because the Petitioners have not established a vested property interest in receiving health insurance, both during and after their tenure on the Board, their request for declaratory judgment is denied. The Court finds that § 27-19.2-7 is rationally related to a legitimate governmental purpose and survives Contract Clause, Substantive Due Process, and Procedural Due Process analysis. Additionally, giving deference to the findings and statutory interpretation of DBR, the Court holds that DBR's determination that health insurance benefits constitute compensation for the purposes of §27-19.2-7 is not clearly erroneous. Because the Petitioners have not prevailed on any of their substantive arguments, the Court denies the Petitioners' prayer for injunctive relief and lifts the stay regarding the Directors' liability for health benefits received after the enactment of § 27-19.2-7. Order to enter consistent with the decision herein.
[1] The motion of all six Directors to intervene herein was granted by the Court.
[2] There has been no change of control within the contemplation of those resolutions.
[3] Although Rhode Island is free to provide greater constitutional protection for its citizens than the Federal Constitution mandates, the Rhode Island Supreme Court has noted that it has yet to hold that Art. I, § 12 places any greater restriction on state legislation than its federal counterpart. Brennan v. Kirby,529 A.2d 633, 637 n. 7 (R.I. 1987). Therefore, this Court may rely on federal case law where appropriate.Id.
[4] For a short history of the Contract Clause and its evolution in the courts, see Allied Structural Steel, Co v.Spannaus, 438 U.S. 234, 256 (Brennan. J. dissenting).
[5] Although Parella involved a public contract, i.e. a contract made with the state, the First Circuit held that the rules regarding a Contract Clause analysis is the same for both public and private contracts.173 F.3d at 59. However, regarding whether the statute is reasonably related to an important public interest, the petitioner has a greater burden of proof in the context of a private contract compared to a public contract. Id. at 60.
[6] The evidence before the Court reflects that BCBS did in fact amend the policy. The record does not disclose whether the Directors received any additional consideration from BCBS when the health insurance benefits were changed.